### PEALE v. MARIAN COAL CO.

(Circuit Court, M. D. Pennsylvania. August 24, 1911.)

No. 55.

1. SALES (§ 8*)—CONSTRUCTION—CONTRACT FOR DELIVERY OF PRODUCT OF COAL WASHERY—RIGHT TO TERMINATE.

A contract between complainant and defendant coal company, which was operating a washery under leases of a culm dump, required complainant to make advances to pay claims against defendant and improve its works; such advances to be secured by a mortgage on defendant's interest in the dump and its machinery. It further provided that all coal produced until the culm bank was exhausted should be delivered to complainant on board cars at the washery and be sold by him for the best prices obtainable without further restriction except as to coal of a specified grade, and that on the 20th of each month he should pay to defendant "the aggregate selling price on board cars at the washery of all coal delivered during the preceding month to his customers on sales made by him," less a commission and a certain sum per ton to be reserved and applied on his advances until the same were repaid. Held, that such contract was not one of agency or factorage under a del credere commission, but was essentially one for the sale by defendant to complainant of its entire product, which gave him a vested interest in the coal and could not be terminated by defendant except upon the strongest grounds, amounting to actual fraud or its equivalent.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 18–19; Dec. Dig. § 8.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. SALES (§ 96*)—EXCUSES FOR NONPERFORMANCE—CONTRACT FOR SALE OF COAL PRODUCTION.

Evidence considered, and *held* insufficient to justify a defendant coal company in repudiating and refusing to further perform a contract by which, in consideration of advances made to it by complainant, it agreed to deliver to him all of the output of its washery until the culm bank on which it was working was exhausted, such coal to be sold by complainant and paid for to defendant monthly, less a commission, no fraud on complainant's part being charged, and no substantial breach by him shown.

[Ed. Note.—For other cases, see Sales, Dec. Dig. § 96.*]

3. SPECIFIC PERFORMANCE (§ 68*)—CONTRACTS ENFORCEABLE—CONTRACT FOR SALE OF COAL PRODUCTION.

A contract by which defendant, a coal company engaged in reclaiming coal from the culm bank of a large colliery, in consideration of advances made to it by complainant, agreed to deliver to him for sale all of the output of its washery until the bank was exhausted, such deliveries, less a commission deducted, to be paid for monthly, *held* specifically enforceable in equity, where the time required to exhaust the dump and the quantity which would be produced therefrom were wholly contingent and uncertain, and the damages resulting to complainant from its breach were incapable of ascertainment at law except by a multiplicity of successive actions extending over an indefinite time.

[Ed. Note.—For other cases, see Specific Performance, Dec. Dig. § 68.

Right to specific performance as affected by adequacy of remedy at law, see note to Marthinson v. King, 82 C. C. A. 368.]

4. EQUITY (§ 53*)—JURISDICTION—ADEQUATE REMEDY AT LAW—TIME FOR OBJECTION.

If a defendant in a suit in equity answers and submits to the jurisdiction of the court, it is too late for him to object that plaintiff had a plain and adequate remedy at law.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 173–176; Dec. Dig. § 53.*]

In Equity. Suit by John W. Peale against the Marian Coal Company. Decree for complainant.

See, also, 172 Fed. 639.

Robert Snodgrass, F. D. Peale, and O'Brien & Kelly, for plaintiff.
Frank E. Donnelly, for defendant.

WITMER, District Judge. The plaintiff, by bill in equity, here seeks relief for an alleged breach of the defendant's agreement to deliver to him coal from its washery at the Holden Culm Dump, which it undertook to do, in return for money advanced by the plaintiff to lift defendant's obligations and to enable it to make necessary improvements and developments for the successful operation of its washery.

The complaint sets forth:

That on the 11th day of April, 1907, a contract was entered into, between the plaintiff and the defendant, which, in so far as is considered pertinent, provides as follows:

Now therefore, in consideration of the premises and of the mutual covenants herein contained, the parties hereto respectively agree as follows:

The party of the first part agrees to use his best efforts to procure a lease from the Hoysradt Estate of its interest in said Holden Bank upon terms as to rate of royalty similar to those contained in said leases from Isaac B.

FEDERAL REPORTER

Felts now owned by the party of the second part, and in case he succeeds in obtaining such lease to transfer the same to the party of the second part in consideration of the issue of twenty-five thousand ($25.000) dollars full-paid and nonassessable capital stock of said party of the second part; it being understood that the capital stock of the party of the second part shall be increased from fifty thousand ($50,000) dollars to seventy-five thousand ($75,-000) dollars for that purpose. The party of the first part further agrees to advance from time to time as the same may be required as aforesaid to meet outstanding obligations of the party of the second part twenty-five thousand ($25,000) dollars, and in addition thereto a sum not to exceed ten thousand ($10,000) dollars to defray the expense of making improvements in said plant and to defray the expense of taking such steps as may seem advisable to protect said bank from destruction by fire by cutting off the portion of said bank that is already on fire.

The party of the second part agrees to accept an assignment of said proposed lease of the Hoysradt interest, provided the terms thereof are satisfactory to it, and to issue to the party of the first part twenty-five thousand ($25,000) dollars of its full-paid and nonassessable capital stock as a consideration for said transfer; to deliver to the party of the first part or his assigns the entire output of the culm bank and washery above referred to, not only until the repayment of the moneys to be advanced hereunder, with interest, but also until the entire exhaustion of said culm bank, including materials deposited hereafter by the Delaware, Lackawanna & Western Railroad Company or its successors or assigns in connection with the operation of the Holden Colliery, except such part thereof as may be sold by the party of the second part under provisions hereinafter contained.

The party of the second part agrees to prepare all the coal to be delivered to the party of the first part as to the sizes, the percentage of impurities and the merchantability and appearance thereof according to the standard of the Delaware, Lackawanna & Western Railroad prevailing in the region where said washery is situated. Railroad weights taken at the scales nearest said washery are to be conclusive between the parties, but upon such weights the usual allowance for water is to be made. The party of the first part shall not, however, be charged for weight of coal shipped to tide water in excess of the weight of coal found upon the cars as determined by the railroad company's scales at tide, nor upon line shipments for weights in excess of the weight charged for by the railroad company in their freight bills. All weights shall be taken in tons of 2,240 lbs. The coal may be inspected at the colliery by a competent inspector appointed by the party of the first part, but satisfactory to the party of the second part, who shall be the agent of both parties and whose wages shall be paid by the party of the first part and one-half thereof shall be charged against the party of the second part and deducted from the price realized by the party of the first part upon the sale of said coal. Whenever possible the coal shall be inspected as it comes from the chutes. In case of disagreement, a test shall be made by taking a bucketful of coal from each end and each side of the car in dispute and if the coal thus taken shall be found fully up to the standard of the railroad company aforesaid, then said car is to be deemed to have passed the inspection. The party of the first part is not authorized to sell coal that is up to said standard for less than the average tide water price paid by the railroad coal companies under the so-called "sixty-five per cent. contracts." After the inspection of the coal the party of the second part shall deliver the same to the party of the first part on board cars to be placed at the colliery by the party of the second part, and said deliveries shall be made in approximately equal monthly proportions. The party of the first part shall not be held responsible for failure on the part of the railroad or transportation companies to furnish facilities for transporting the coal, nor for failure to sell the entire output when prevented from so doing by causes beyond his control. The party of the first part agrees, however, to render such assistance as is in his power to have cars placed to receive the coal. For the purpose of this agreement, the respective sizes of the coal shipped from said washery shall conform to the standard, and be made over meshes corresponding in size to the meshes

used by the Delaware, Lackawanna & Western Railroad Company in the Lackawanna region.

The party of the first part agrees to use due diligence to market the coal delivered to him hereunder so as not to cause suspension of operation by reason of any embargoes by the railroad company on account of accumulation of coal in cars beyond the proper allowance to the party of the second part.

The party of the first part shall be responsible to the party of the second part for the payment of the agreed price at which all coal shipped to his customers shall have been sold, less the freight thereon paid by the party of the first part, and he agrees to pay to the party of the second part on the 20th of each month the aggregate selling price on board cars at the washery of all coal delivered during the preceding month to customers upon sales made by him, except that from the proceeds of such sales the party of the first part is hereby authorized to deduct the reserve hereinafter referred to, and apply the same toward the payment of said advances, and a commission of ten (10¢) cents a ton on each ton of pea and smaller sizes and of twenty (20¢) cents a ton on each ton of sizes larger than pea shipped from said washery or culm bank.   *   *   *

The moneys to be so advanced by the party of the first part shall be repaid, with interest thereon at the rate of six (6%) per cent. per annum, as follows: Out of the proceeds of coal sold by the party of the first part under the terms of this agreement, or out of the price to be paid by the party of the first part for coal purchased by him in case any of the coal from said washery shall be purchased by him during the term of this agreement, the sum of twelve and one-half (12½¢) cents per ton upon each and every gross ton of coal of the size of pea or smaller sizes and the sum of twenty-five (25¢) cents a ton for each and every gross ton of sizes larger than pea shipped from said washery or culm bank may be retained by the party of the first part to apply at intervals, as the respective notes to be given by the party of the second part for the amounts to be advanced hereunder or any renewals thereof may mature, to payment pro tanto of such loans and interest thereon. The notes which are to be given by the party of the second part for the amounts advanced hereunder by the party of the first part from time to time are to be for such amounts and are to be made to mature on such dates that at least one note shall mature in each month, and, as such note or notes mature, such reserve shall be applied to the payment thereof; the intention being that this application shall be made monthly so as to save the party of the second part from loss of interest upon the amount of the reserve, except to the extent necessarily involved in applying the reserve only once a month.

At least ten thousand ($10,000) dollars, with interest upon the balance of such advances remaining at the time unpaid, shall be repaid by the party of the second part either by the application of said twelve and one-half (12½¢) cents and twenty-five (25¢) cents a ton as aforesaid or otherwise during each of the years subsequent to the date of this agreement until the entire amount due shall have been repaid.   *   *   *

In case the party of the second part shall fail to promptly keep, observe and perform, without default, each and every of the stipulations of this agreement or of its lease or leases with Isaac B. Felts, with the Hoysradt Estate and with the Delaware Lackawanna & Western Railroad Company, if a lease is obtained from said company, or in case of its failure to pay taxes or the wages of its laborers, miners or other workmen when due, and such default in either of the preceding cases shall continue for thirty days after notice thereof from the party of the first part, or in case the party of the second part shall default in the payment of principal or interest or any portion thereof when due, or shall make an assignment for the benefit of creditors, or become bankrupt, or in case of levies upon its property by creditors which, in the judgment of the party of the first part, shall jeopardize his security, or in case of its failure to pay royalties when due, then and in either of such cases all terms of credit hereby stipulated for shall forthwith cease and terminate and the notes of the party of the second part hereinafter mentioned and so much of said loans and advances, with interest, as shall not

then have been repaid, and all other sums for which the party of the second part, shall then be liable hereunder shall thereupon at once become and be due and payable immediately, anything herein or in any connected or other instrument or writing to the contrary notwithstanding.

Repayment of the moneys to be advanced hereunder, with interest thereon, and due performance of the terms and stipulations of this agreement and of the leases aforesaid shall be secured in manner following, due performance of each being expressly understood to be of the essence of this contract and a material part of the security of the party of the first part:

First. At least one week prior to the date upon which the party of the second part shall require an advance to be made by the party of the first part, it shall give to the party of the first part its promissory note or notes, bearing interest at six (6%) per cent., aggregating the amount of such advance or advances, said note or notes to mature in not to exceed six months from the date of such advance and to be payable at such bank as the party of the first part may designate, and said notes as they mature shall be renewed by the party of the first part to the extent of any balance remaining unpaid until the time of repayment as herein fixed shall be reached. In case, by reason of such renewals, the time of payment of the installments of principal shall be ostensibly extended beyond the end of the first or any other year above mentioned the amounts which are to be paid by the party of the second part pursuant to the terms of this agreement at the times above stated shall nevertheless fall due as above stated, anything in said notes to the contrary notwithstanding.

Second. As security for the repayment of said notes or any renewals thereof, and for the due performance of this agreement, the party of the second part agrees to execute and deliver to Franklin D. Peale, trustee, its certain mortgage in the sum of thirty-five thousand ($35,000) dollars upon its leasehold interests in said Holden Bank under the aforesaid leases and also upon all its machinery, tools, buildings and improvements of every kind upon, over, in or about the premises embraced in the aforesaid leases, including the washery and culm pile aforesaid and all such property as is now or shall hereafter become a part of or be used in the plant of said company in and about its said operation and upon all its rights, franchises, property, goods and chattels of every kind and description, together with all easements, licenses, permits, rights of way, buildings, pipes, engines, boilers and machinery, tools and fixtures and other property of every kind forming a part of said plant or used in connection therewith. * * *

Seventh. In case of any alleged default hereunder or under the leases above referred to, the party of the first part shall give to the party of the second part notice in writing of such alleged default, and in case said party of the second part does not remove said cause of default within thirty days thereafter, then and not until then, the party of the first part may cause any attorney of the court of common pleas of Lackawanna county or any other proper county to enter in said court an amicable action of ejectment against the party of the second part for the premises embraced in said leases and the party of the second part hereby authorizes any attorney of said court to confess judgment in said amicable action of ejectment upon filing an affidavit setting forth the facts of such default claimed and that the notice required as aforesaid has been given to the party of the second part, and thereupon a writ of habere facias possessionem may issue upon said judgment; provided, however, that if the party of the first part shall, under the terms hereof, take possession of the premises under such judgment and writ of possession, if the party of the second part shall, within sixty days thereafter (time being of the essence of this agreement) make good said default and repay and fully reimburse to the party of the first part all his proper expenses, outlays and payments, including an attorney fee not to exceed two (2%) per cent. of amount then owing to party of first part, then the party of the first part shall restore the party of the second part to possession of the property and the party of the first part shall account to the party of the second part for all net profits earned meantime; provided that the entry of such judgment shall not prevent the party of the first part from proceeding

to recover by any process or proceeding any amount that may be owing for moneys so advanced as aforesaid, whether the same shall be represented by notes or otherwise; and provided also that the remedies hereby provided shall be deemed to be concurrent with and not exclusive of the remedies above provided in paragraph "fourth." * * *

It is further agreed that in case the party of the second part shall be offered, for any portion of the output of said washery, the delivery of which has not already been contracted for by the party of the first part with the approval of the board of directors of the party of the second part, higher prices than the party of the first part is able to obtain for the same, then and in that case the party of the second part may submit said offer to the party of the first part and require him to make delivery thereupon. If the party of the first part shall fail without proper reason, to make said delivery, the party of the second part may make said delivery for its own account, paying to the party of the first part one-half instead of the whole of the commission per ton herein provided for. * * *

It is further agreed that in spite of the provisions of this contract providing for the delivery of the output of said Marian Washery f. o. b. cars at the washery, the party of the first part shall be deemed a commission merchant selling the output of the washery of the party of the second part under a del credere commission.

That pursuant to the terms of said contract the complainant advanced, by way of loan, to the defendant a large sum of money, to wit, $37,364.27, exclusive of interest. That upon the amount so advanced there has been repaid the sum of $12,781.77, leaving due and unpaid on said account, January 28, 1909, the sum of $24,582.50.

That the defendant is engaged in the business of carrying on a coal washery operation in the borough of Taylor, county of Lackawanna, Pa., where it prepares for market coal from the Holden Culm Dump, located along the Delaware, Lackawanna & Western Railroad. That, pursuant of the contract between the complainant and the defendant, the latter proceeded to ship coal to the former on the 17th day of May, 1907, and from that time until the 13th day of October, 1908, it did ship coal to the complainant and receive from him payment therefor in accordance with said contract. That on the day last mentioned the defendant ceased to ship its coal to the complainant, as it had undertaken to do by virtue of its contract, and until henceforth had utterly failed to ship to the complainant the product of its washery, or any part thereof, without excuse or just cause, although having often been requested to do so, resulting in great damage to the complainant.

That the defendant has since been operating said washery and preparing and shipping coal to market from the said culm dump through other agents or parties than the plaintiff, and that such culm bank is not exhausted. That there are yet remaining many thousand tons of coal in said dump, and that large quantities are being added thereto daily by deposits from the Delaware, Lackawanna & Western Railroad Company in connection with the operation of the said Holden Colliery. That it is impossible to anticipate the length of time which will be required to exhaust the said dump, or the amount of coal which may be ultimately taken therefrom, for the reason that the length of time will largely depend upon the extent of the operations which may be conducted at the said washery and the amount of the output, and because it is altogether conjectural and uncertain what amount of materials may be deposited in the future upon the said dump by the Delaware, Lacka-

wanna & Western Company in connection with the operation of the Holden Colliery. That the complainant has already suffered large damages, and will continue in the future to suffer to an extent which it is impossible now to determine. Wherefore he is remediless in the premises at law and prays for relief in this court, to wit:

(a) For damages for the coal diverted, and for discovery of the amount as the basis for determining them.

(b) For a decree requiring the defendant to repay the balance of the sum advanced by the plaintiff to the complainant.

(c) For specific performance of said contract.

(d) For an injunction restraining the defendant from shipping coal to other persons than the complainant.

(e) For general relief.

The defendant admits the execution of the contract in suit and the loan of $35,000 by the plaintiff to it on account of which it insists the plaintiff has received a credit of the sum of $17,000, and that it (the defendant) is entitled to a further credit of $1,988.21 for 24,647 tons of coal delivered to the plaintiff and sold by him without defendant's consent at various prices below the minimum stipulated in said contract.

The answer furthermore sets forth that by reason of the plaintiff's violations of the terms of said contract he has prevented the defendant from further attempting to comply with the same. The violations referred to and the reasons assigned by the defendant for not attempting further to comply with such contract may be gathered from its answer and summoned up substantially as follows:

(1) That the plaintiff deducted from funds, realized from the sale of coal, without authority and under protest of the defendant, certain amounts for alleged overpayment on condemned coal, for alleged services of plaintiff's attorney, and the sum of $3,600 for reason not specially set forth.

(2) That the treasurer of the plaintiff failed to make reports of his accounts and funds when requested so to do by the defendant, and failed to pay bills when presented and approved by the defendant.

(3) That the plaintiff sold certain coal below the minimum price stipulated in the contract, and refused, on request, to render accounts of his sales of coal and to inform the defendant at what price and to whom the coal was sold, and also refused to allow the defendant to examine his books for the purpose of learning these facts.

(4) That plaintiff has refused to deliver to defendant possession of a certain lease procured by it from the Delaware, Lackawanna & Western Company granting the defendant the right to reclaim from the Holden Dump that part of the coal claimed and owned by said company on terms similar to other leases held by it.

These are briefly the alleged grounds upon which the defendant refused to deliver any of its coal to the plaintiff after the 13th day of October, 1908. Is its conduct to be justified on examination in the light of the evidence and the provisions of the contract?

[1] This therefore requires a partial analysis of the contract to determine its nature, and the duties and obligations of the several parties thereunder. Incidentally it is said that the relations of the plaintiff to

the contract is that of an agent with a del credere commission. A careful examination, however, of its terms and conditions, will show very clearly that it is much more, so far as the rights, duties, and obligations of the parties are concerned, than would be involved in such a contract.

Under its provisions the plaintiff agrees to advance to the defendant moneys to the amount of $35,000 for its benefit, to release its obligations, and to enlarge and improve its plant so as to operate it to better advantage. In consideration of such advance, the defendant agreed "to deliver to the party of the first part (the plaintiff) or his assigns the entire output of the culm bank and washery above referred to, not only until the payment of the moneys to be advanced, with interest, but also until the entire exhaustion of said culm bank, including materials hereafter deposited thereon by the Delaware, Lackawanna & Western Railway Company, or its successors or assigns, in connection with the operation of the Holden Colliery."

It is further agreed "to prepare all the coal to be delivered to the party of the first part (the plaintiff) as to the sizes, the percentage of impurities, and the merchantability and appearance, according to the standard of the Delaware, Lackawanna & Western Railroad, prevailing in the region where the said washery is situated," and that the respective sizes of the coal shipped from said washery should conform to the standard, and be made over meshes corresponding in size to the meshes used by the said railway company in the Lackawanna region.

It is not expressly stated in terms in the contract that the plaintiff shall sell the coal so delivered "for account of the defendant," but that it shall be disposed of by the plaintiff "for the best price that can be obtained for the same," saving, however, in respect of coal which is "up to said standard," that it shall not be sold for less than the average tide water price paid by the railroad coal companies under the so-called 65 per cent. contracts. From the proceeds of all sales so made, the plaintiff is expressly authorized to deduct the freight paid thereon, a reserve or sinking fund "of twelve and one-half (12½) cents per ton upon each and every gross ton of coal of the size pea, or smaller sizes, and the sum of twenty-five (25) cents a ton for each and every gross ton of sizes larger than pea," and to apply the same at intervals, toward the payment of his advances. He is further authorized to deduct a commission of "ten (10) cents a ton on each ton of pea and smaller sizes, and of twenty (20) cents a ton on each ton of sizes larger than pea, shipped from said washery or culm bank," to cover expenses of marketing and his services in making sales, and after deducting these amounts the balance is to be paid to the defendant.

In marketing the coal there is no restriction upon the plaintiff, as to price, except to coal which is "up to the standard"; but this restriction implies, under all the rules of construction, independently of the express agreement evidenced by letters of December, 1907, and January, 1908, the right to sell all coal which was not "up to the standard," for the best price that could be obtained therefor. Besides, he was not limited, in respect of sales, to any market. He could sell to whomsoever he pleased, and through any agencies, and in any manner which

in his judgment would produce the best results. In other words, he had a free hand, except in the selling price of coal which was "up to the standard."

The plaintiff is further required, by the contract, to pay to the defendant "on the 20th of each month the aggregate selling price on board cars at the washery of all coal delivered during the preceding month to (his) customers upon sales made by him," and is expressly responsible for the payment to the defendant of such aggregate price whether the coal was "up to the standard" or not.

There are numerous other provisions in the contract, as to the duties and obligations of the parties, to which it is not necessary now to refer, as it seems entirely clear, from the entire contract in the light of what has been made to appear, that the relations of the parties are and were intended to be substantially that of vendor and vendee. It specifically provides for a delivery to the plaintiff of all coal produced, and the payment by him, not conditionally but absolutely, on the 20th of each month, for all coal sold and delivered during the preceding month. In other words, it contains all the elements necessary to constitute a sale of all the coal produced to the plaintiff.

There is no restriction upon such sales, except as already stated, nor is there any provision for reports to the defendant of prices, names of purchasers, or other details, nor as to the manner of keeping the accounts. The keeping of accounts is, of course, necessarily implied, presumably as they had theretofore been kept in previous dealings between the parties. · All the plaintiff was required to do was to exercise diligence in securing the best price possible in making sales of the defendant's coal, in which he was to an extent bound by the contract, and to pay to the defendant, on the 20th of each month, after making the deductions provided for, the *aggregate selling price* on board cars at the washery, for all coal sold and delivered during the preceding month. When this was done, the defendant had received all that it was entitled to receive, until the plaintiff's advances were repaid with interest.

It seems therefore that the plaintiff should not be treated simply as the agent or factor of the defendant under a del credere commission. It is true that under such a contract the vendor would become liable, in the same manner as if he himself were the purchaser of the coal; but such a relation does not imply any interest whatever in the goods themselves. The agent, in such case, in consideration of a special commission, simply engages to pay for the goods if the purchaser fails to do so. In other words, he guarantees such payment, and this is an essential feature, which distinguishes a del credere commission from an ordinary agency. Even if the contract does involve an agency with a del credere commission, it has been expressly held that in such case the factor "becomes liable to his principal when the purchase money is due, as between him and his purchaser he then in effect becomes the purchaser, and is substituted for the purchaser, and is bound to pay not conditionally, but absolutely in first instance." Cartwright v. Greene, 47 Barb. (N. Y.) 9.

As argued by counsel for defendant, whether, therefore, the plain-

tiff is to be considered an agent with a del credere commission, or a factor for the sale of coal, it is obvious, from the contract itself, that he has a vested, and indeed a very important, interest in the subject-matter of the contract, and had such interest at the time it was repudiated by the defendant. He had at that time advanced at least $35,000 for the use and benefit of the defendant. For the repayment of these advances he relied upon the sale of the coal which might be produced at the washery, holding at the same time as security a mortgage upon an interest in the culm dump. A diversion of the coal therefrom, to any other agency, will in effect destroy his security, to the extent that a continued operation of the washery will reduce the coal in such dump. The plaintiff, it will be admitted, had therefore from the very inception of the operations of the defendant, under this contract, a large vested interest in the subject-matter of such contract, so that it could not be terminated by the defendant but for the strongest possible grounds, amounting to actual fraud, or conduct equivalent thereto.

[2] Before entering upon examination of the conduct of the plaintiff, assigned by the defendant for his repudiation of the contract, it is of importance to note the status of the parties and their business relations prior to the contract in suit.

The Marian Coal Company was organized and existed for the sole purpose of reclaiming marketable coal from the Holden Dump. The improvements erected on the ground near the dump for this purpose were practically the only assets of the company, excepting, of course, certain leasehold rights to reclaim such coal. The coal in this dump was claimed by Isaac B. Felts, the estate of Jacob Hoysradt, and the Delaware, Lackawanna & Western Railroad Company, to whose joint credit royalties were deposited in bank for the coal taken. It appears that the Boland brothers then owned all of the capital stock of the defendant, being also creditors of the company for upwards of $20,000. For more than a year before entering into the contract of April 11, 1907, the plaintiff, as general manager of Peale, Peacock & Kerr of New York, had sold the output of the washery of the defendant company. While so doing, he had accounted to defendant by statement showing in detail the price received for each boat load of coal sold to customers at tide, omitting the name, and the price and name of each customer to whom delivery was made by rail. It appears, therefore, that the parties were not strangers to each other, and that their business methods were well known and intended to be carried on in their new relations.

Now, as to the first assignment of defendant, it might be sufficient to say that, even if the plaintiff caused to be improperly deducted the items specified from the defendant's account, it would not be justified in breaking the entire contract. The items are trifling, with one exception, as compared with the import of the contract. In any aspect, it appears to involve a mere matter of bookkeeping. If any such payments were erroneously made, it could easily have been adjusted and corrected between the parties in future settlement without the risk of loss, bearing in mind that the defendant was at all times the debtor

190 F.—25

of the plaintiff. It, however, now appears from all the evidence in the case that the deductions were proper, with the possible exceptions of the item ($145) claimed by plaintiff for traveling expenses, and item ($125) paid for legal services, which do not appear authorized by the contract, and cannot in the light of the evidence be justified otherwise; nevertheless these deductions were made honestly but mistakenly and not with the intent to defraud, and will not be made to serve the defendant.

As to the second complaint, suffice to say that continuance of the contract as contemplated by the parties cannot be predicated upon the conduct of the defendant's treasurer though nominated by the plaintiff. If, however, the treasurer's failure to perform his duties could be charged to the plaintiff, the defendant would not be prejudiced thereby. The record is convincing of the honesty and efficiency of this officer. His accounts were faithfully kept and his duties performed in a manner to his credit, which we have a right to presume the defendant had in mind when they declined to displace him until long after this suit. The books, kept by him, were supervised by a reputable firm of certified accountants who audited them and found them correct, and there is no evidence to the contrary. The books having always been open for inspection, and if the system employed appeared complicated and confusing to the manager and secretary of the defendant company, and they had good reason to doubt the accuracy of the state of the accounts, good business policy should have suggested to them the propriety of an examination and audit of them by expert accountants as a remedy. This would have served a better purpose than the mass of reports willingly furnished by the treasurer on request, and the flood of correspondence that passed between the parties to which this suit no doubt must be attributed.

The third ground upon which the defendant seeks to justify its action seems to be regarded by it as the most flagrant of plaintiff's alleged offenses. The allegation does not charge fraud, or that the plaintiff wrongfully sold coal at prices below the minimum price stipulated in the contract, but that he refused to render an account of sales generally and inform the defendant at what price and to whom the coal was sold, and further that he refused to allow the defendant to examine the books to ascertain these facts.

It is to be noted that the plaintiff had for about a year been selling all of the output of defendant's washery, that part of it was sold on a commission and guaranty basis, as provided in this contract, that reports were rendered monthly of the same character as to information therein contained similar to those furnished after date of the contract, and that in spite of this practice the defendant did not stipulate for reports with names of customers. The practice thus established, in this regard, they are presumed to have had in mind when they entered into this contract and should govern even though a general custom to the contrary had been proven. It is to be remembered that the plaintiff, after making certain deductions, was required by the contract to pay to the defendant on the 20th of each month *"the aggregate selling price* on board cars at the washery" of all coal delivered during the preceding month,

whether paid for or not. The names and addresses of the plaintiff's customers would have served no legitimate purpose to the defendant. It is easily understood how they might have been used to the detriment of the plaintiff, and being his private property, he was not bound to disclose them. All that the defendant could require or demand was a report of such facts as would enable its officers to determine whether the plaintiff had accounted for all coal sold and delivered, and the aggregate of such sales. Such reports the plaintiff regularly furnished. Any further necessary information required could have been readily obtained from the records provided for the purpose.

Did the plaintiff sell coal below the minimum prices provided by the contract? The coal shall be prepared as to sizes, impurities, appearance and merchantability according to the Delaware, Lackawanna & Western Railroad Company's standard prevailing in the region of the washery, and shall not be sold when "up to standard" for less than the average tide water price paid by the railroad coal companies, under the so-called 65 per cent. contract.

Now the average tide water price of coal is the average of prices obtained by the coal companies at tide water, known to the trade as the Ruley price, ascertained in the Bureau of Coal Statistics at the head of which was a Mr. Ruley; hence the name. The defendant claims for its coal Delaware, Lackawanna & Western Railroad circular prices at tide. This is admitted to be the maximum price at which coal sells at tide. It is true that the Marian Company agreed to prepare its coal in accordance with the Delaware, Lackawanna & Western Company's standard. The contract, however, does not require the plaintiff to obtain the company's circular prices. It requires him to obtain for this coal of standard preparation the best prices he could procure above the average or Ruley prices. The evidence submitted is strong and convincing that such prices the plaintiff obtained for all of the coal sold "up to standard."

During a period of 18 months including two summers when prices are usually low, the plaintiff sold 72,487.08 tons of coal, good, bad, and indifferent, for which defendant received an actual credit (deducting commissions) of $37,296.67. This is but $1,767.35 less than Delaware, Lackawanna & Western Railroad Company's circular prices and within $356.31 of the Ruley prices. Bearing in mind that all of this coal was culm or dump coal, and that many thousand tons of it was actually condemned by the defendant's inspectors, and much of it sold by special agreement, the showing is to the credit of the agent.

It is further complained that the plaintiff's personal attorney refused on demand to turn over to the officers of the defendant a certain lease from the Delaware, Lackawanna & Western Railroad Company to it of an undivided interest in the culm bank in question. How this lease came into his possession is fully explained is the testimony, which shows ample justification for his retention. The defendant, however, did enjoy its fruits without hindrance. If the plaintiff should be personally held responsible for this act of his attorney, it is not made to appear that it operated to the injury of the defendant.

In considering the reasons assigned by the defendant for his refusal

further to comply with its contract, it will be observed that no fraud is alleged or proven, nor is it anywhere shown that the defendant has suffered any specific loss by reason of the alleged derelictions of the plaintiff. It will not suffice it to make general charges of loss. To justify its action it was incumbent upon it to show what loss or damage, if any, it had suffered, and how its alleged embarrassment operated to its injury. In view of these conclusions, it must follow that the defendant was not justified in repudiating the contract between the parties, or in refusing on its part to deliver the coal produced from the culm bank and washery in question to the plaintiff under the terms of such contract. Hence, the court having jurisdiction, the plaintiff is entitled to some remedy.

[3] The defendant demurs and contends that the plaintiff can by a recovery of damages have a complete or adequate remedy at law, and is therefore not entitled to relief here. The admission of this doctrine and its application to such cases as the one under consideration would practically divest courts of equity of all jurisdiction to compel specific performance of real contracts.

As a matter of fact it appears impossible to anticipate the length of time required to exhaust the dump, or to estimate the amount of coal that may ultimately be taken therefrom, because it will largely depend upon the extent of the operation which may be conducted at the washery and the amount of the output, and because it is altogether conjectural and uncertain what amount of materials may be deposited in the future upon the dump of the Delaware, Lackawanna & Western Railroad Company in connection with the operation of the Holden Colliery, and therefore the plaintiff's damages are not susceptible of liquidation.

"That the plaintiff could maintain an action at law for damages, for breach of the contract, there is no doubt; but it is a well-settled rule that, although the action at law will lie, yet if there is an utter uncertainty in any calculation of damages for the breach of the covenants, and the measure of the damages is largely conjectural, equity will intervene because of the inadequacy of the remedy, and enforce performance of it by injunction. Palmer v. Graham, 1 Pars. Eq. Cas. (Pa.) 476; Wilkinson v. Colley, 164 Pa. 43 [30 Atl. 286, 26 L. R. A. 114]."

It is evident, furthermore, that in order to recover damages by remedy at law it would be necessary to resort to a multiplicity of suits. The plaintiff might bring suit monthly to recover damages for loss of profits for the preceding month, or he might resort to annual suits. He could not recover in any one suit for all of the damages, because it would be impossible to ascertain or to show what the damages would amount to in any one suit, for reasons which are clearly obvious. He could not wait until the entire dump should have become exhausted, because it might be that by that time a substantial part of his claim might be barred by the statute of limitations. Furthermore, no plaintiff is required to wait after a breach of contract has occurred, and unless one action can be brought in which adequate relief could be obtained equity will always take jurisdiction. Bank of Kentucky v. Schuylkill Bank, 1 Pars. Eq. Cas. (Pa.) 180; 16 Cyc. 60, 63.

Many authorities upon this general proposition might be cited;

but the court is satisfied, as argued by counsel for plaintiff, that this question was settled by this court, Judge Archbald presiding, in the initial stage of the case upon demurrer. In his opinion he said:

"As to the further ground of demurrer, that the plaintiff has a complete remedy at law by action for damages, it is sufficient to say that the bill seeks the specific performance of the defendant's agreement, to deliver coal from their washery at the Holden Culm Dump, which they undertook to do in return for the money advanced by the plaintiff to make the necessary developments. For this it is evident that damages for a breach of the contract would not be at all adequate. Nor is this disturbed because the plaintiff, in the same connection, asks damages for the coal so far diverted, and calls for a discovery of the amount as the basis for determining them. Equity, having taken jurisdiction, will dispose, if possible, of the whole of the controversy, and the plaintiff is entitled to be made good for the commissions which he has lost as a part of it."

[4] Moreover, it is now, in any event, too late to take objection to the jurisdiction of the court. As stated by Justice Brewer in Brown v. Lake Superior Iron Co., 134 U. S. 530, 536, 10 Sup. Ct. 604, 606 (33 L. Ed. 1021), adopting the language in earlier cases:

" * * * If the objection of want of jurisdiction in equity is not taken in proper time, namely, before the defendant enters into his defense at large, the court having the general jurisdiction will exercise it; and in a note (in 1 Dan. Ch. Prac. [4th Am. Ed.] p. 550) many cases are cited to establish that, 'if a defendant in a suit in equity answers and submits to the jurisdiction of the court, it is too late for him to object that the plaintiff had a plain and adequate remedy at law. This objection should be taken at the earliest opportunity.' "

Attention is also called to the language of the same learned justice in Hollins v. Brierfield Coal & Coke Co., 160 U. S. 371, 380, 381, 14 Sup. Ct. 127, 37 L. Ed. 1113.

Regarding the remedy provided for in the contract, it is sufficient to note that, while it might afford redress for the failure to repay the plaintiff's loan, it gives none for the loss of his commissions. Furthermore, this court, having obtained jurisdiction, will retain such for the purpose of administering complete relief and doing justice with respect to the subject-matter.

It is therefore adjudged and decreed:

First. That the defendant be ordered and directed to specifically perform its contract with the plaintiff by delivering to the plaintiff from the date of this decree the output of its washery.

Second. That the defendant be enjoined by perpetual injunction from delivering any of the output of the washery and the Holden Dump to any one other than the plaintiff.

Third. That the defendant be and it is hereby required to account to the plaintiff for all moneys advanced by the plaintiff to it under the contract, which has not already been repaid, together with interest thereon, and that the defendant be required to account to the plaintiff for all damages sustained by the plaintiff by reason of the defendant's breach of contract.

Fourth. That J. Fred Schaffer, Esq., be appointed a special examiner to state an account between the parties and report the same to the court.