# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS THE CIRCUIT AND DISTRICT COURTS AND THE COMMERCE COURT

---

## TEXAS CO. v. CENTRAL FUEL OIL CO. et al.

### (Circuit Court of Appeals, Eighth Circuit. February 13, 1912.)

### No. 3,652.

**1. VENUE (§ 7*)—LOCAL OR TRANSITORY ACTION—SUIT FOR SPECIFIC PERFORM-ANCE.**

A suit to enforce specific performance of a contract by which defend-ants agreed to deliver the oil produced from wells operated by them into the pipe lines of complainant extending to such wells is personal and transitory, and may be maintained in any court having jurisdiction of the person of defendants.

[Ed. Note.—For other cases, see Venue, Cent. Dig. §§ 13–16; Dec. Dig. § 7.*]

**2. COURTS (§ 269*)—FEDERAL COURTS—DISTRICT OF SUIT—LOCAL ACTIONS.**

Where a contract gave complainant a lien to secure its performance on property of defendants, consisting of oil leases and wells, a suit to enforce such contract and lien may, under the federal judiciary act (Act March 3, 1875, c. 137, § 8, 18 Stat. 472 [U. S. Comp. St. 1901, p. 513]), be main-tained in the district in which the property is situated, regardless of the residence of the parties, provided the requisite diversity of citizenship exists.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 809; Dec. Dig. § 269.*

Jurisdiction of federal courts as affected by possession of subject-mat-ter, see note to Adams v. Mercantile Trust Co., 15 C. C. A. 6.]

**3. COURTS (§ 276*)—FEDERAL COURTS—DISTRICT OF SUIT—WAIVER OF OBJEC-TION.**

The objection of a defendant that a federal court is without jurisdic-tion because neither complainant nor defendant is a resident of the dis-trict, where the requisite diversity of citizenship exists, is waived by the filing of a general demurrer going to the merits of the bill.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 815; Dec. Dig. § 276.*

Waiver of right as to district in which suit may be brought, see note to Memphis Savings Bank v. Houchens, 52 C. C. A. 192; McPhee & Mc-Ginnity Co. v. Union Pac. R. Co., 87 C. C. A. 634.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

194 F.—1

4. APPEAL AND ERROR (§ 878*)—REVIEW—ASSIGNMENT OF CROSS-ERRORS.

An appellee or defendant in error who takes no appeal or writ of error himself cannot by assigning cross-errors, or by brief or argument confer on a federal appellate court jurisdiction to consider, review or decide upon rulings against him in the court below.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3573–3580; Dec. Dig. § 878.*]

5. UNITED STATES (§ 125*)—JURISDICTION OF FEDERAL COURTS—SUIT AGAINST INDIAN AGENT.

An agent of the Interior Department having charge of the affairs of Indian tribes under direction of the Secretary is not exempt from process of the court, and is a proper, although not indispensable, party to suit to determine rights under leases of Indian lands.

[Ed. Note.—For other cases, see United States, Cent. Dig. §§ 113, 114; Dec. Dig. § 125.*]

6. CORPORATIONS (§ 506*)—PARTIES—SUIT AGAINST CORPORATION.

To a suit in a federal court against a corporation to enforce specific performance of a contract made by it in behalf of subsidiary companies which it controls through ownership of their stock, such subsidiary companies are not indispensable nor even necessary parties.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1958–1970; Dec. Dig. § 506.*]

7. SPECIFIC PERFORMANCE (§ 5*)—JURISDICTION OF EQUITY—REMEDY AT LAW.

A remedy at law to exclude the jurisdiction of a court of equity of a suit for specific performance must be plain and adequate, and as certain, prompt, complete, and efficient to attain the ends of justice and its prompt administration as the remedy in equity.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 5–8; Dec. Dig. § 5.*]

8. SPECIFIC PERFORMANCE (§ 5*)—JURISDICTION OF EQUITY—INADEQUACY OF LEGAL REMEDY.

The insolvency of a defendant is a circumstance proper to be considered in determining whether equity has jurisdiction of a suit for specific performance of a contract on the ground that the remedy at law by an action for its breach is inadequate.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 5–8; Dec. Dig. § 5.*]

9. SPECIFIC PERFORMANCE (§ 68*)—CONTRACTS ENFORCEABLE—CONTRACTS RELATING TO PERSONAL PROPERTY.

A contract relating to personal property may be specifically enforced in equity where the property is such that it cannot be obtained in the market, or only at great expense and inconvenience, and a failure to obtain it would cause a loss to complainant which could not be adequately compensated in an action at law.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 199; Dec. Dig. § 68.*]

10. SPECIFIC PERFORMANCE (§ 75*)—GROUNDS FOR RELIEF—CONTRACT FOR SALE OF OIL PRODUCTION.

Complainant, which operated an oil pipe line in Texas and into Oklahoma and also several refineries, entered into a contract with defendant, which through subsidiary companies owned a number of leases on which it operated wells in the Bartlesville oil field in Oklahoma, by which complainant agreed to extend its pipe line to such field and to a connection with defendant's wells, and defendant agreed to run all of its oil into such line for a term of 10 years, to be paid for by complainant as provided for by the contract. At that time there was but one pipe line in such field, and defendant was compelled to accept the prices made by it without the benefit of competition while complainant needed the oil for its

refineries. Complainant built the extension of its pipe line at a cost of $700,000, and for a time received the oil from defendant's wells, after which defendant refused to make further deliveries. *Held*, that complainant was entitled to enforce specific performance of the contract in equity, on a bill alleging such facts; that defendant was insolvent; that without the oil contracted for its pipe line extension was comparatively valueless; and that it could not otherwise procure sufficient oil to keep its refineries in full operation.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 210; Dec. Dig. § 75.*]

11. SPECIFIC PERFORMANCE (§ 75*)—CONTRACTS ENFORCEABLE—CONTRACT FOR CONTINUOUS ACTS.

It is no objection to the specific enforcement in equity of a contract for the sale of the production of oil wells, to be delivered into the purchasers' pipe line, that the contract extends over a term of years, there being no personal services, skill, or judgment required, nor anything likely to require the supervision of the court if the contract is performed in good faith.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 210; Dec. Dig. § 75.*]

12. APPEAL AND ERROR (§ 1078*)—REVIEW—QUESTIONS NOT ARGUED.

An issue raised by the pleadings, but not argued in the appellate court, will be treated as abandoned, and not considered.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4256–4261; Dec. Dig. § 1078.*]

13. SPECIFIC PERFORMANCE (§ 16*)—CONTRACTS ENFORCEABLE—FAIRNESS.

A contract is not unconscionable in such sense that it will not be specifically enforced in equity because by reason of matters arising after it was made it has become more burdensome on one of the parties than was anticipated, nor because the cost of performance by the other party was less than anticipated.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 35, 36; Dec. Dig. § 16.*]

14. APPEAL AND ERROR (§ 870*)—REVIEW—INTERLOCUTORY ORDERS—APPEAL FROM FINAL DECREE.

While under section 7 of the act establishing Circuit Courts of Appeals (Act March 3, 1891, c. 517, 26 Stat. 828), as amended by Act Feb. 18, 1895, c. 96, 28 Stat. 666, and Act June 6, 1900, c. 803, 31 Stat. 660 (U. S. Comp. St. 1901, p. 550), and Act April 14, 1906, c. 1627, 34 Stat. 116 (U. S. Comp. St. Supp. 1909, p. 220), an appeal does not lie from an order refusing to grant a temporary injunction or to appoint a receiver, such an order is reviewable on appeal from a final decree dismissing the bill.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3451, 3487–3512; Dec. Dig. § 870.*

Finality of judgments and decrees for purposes of review, see notes to Brush Electric Co. v. Electric Imp. Co. of San Jose, 2 C. C. A. 379; Central Trust Co. v. Madden, 17 C. C. A. 238; Prescott & A. C. Ry. Co. v. Atchison, T. & S. F. R. Co., 28 C. C. A. 482.]

15. SPECIFIC PERFORMANCE (§ 108*)—PRELIMINARY INJUNCTION—SUIT FOR SPECIFIC PERFORMANCE.

In a suit for specific performance of a contract, where the bill states a cause of action for such relief, complainant is entitled to a preliminary injunction to restrain violation of the contract, and such injunction may be granted if the equities require it, even if the contract is one not specifically enforceable.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 353; Dec. Dig. § 108.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes'

Appeal from the Circuit Court of the United States for the Eastern District of Oklahoma.

Suit in equity by the Texas Company against the Central Fuel Oil Company and others. From a decree dismissing the bill on demurrer, complainant appeals. Reversed.

The appellant, a corporation created by and having its domicile in the state of Texas, filed its bill in the court below against the defendants, seeking specific performance of a contract made by it with the defendant Central Fuel Oil Company. A temporary restraining order was granted on an ex parte hearing on the bill and affidavits filed with it. The defendants Bankers' Trust Company, Indian Territory Illuminating Oil Company, Sagamore Oil & Gas Company, Waukesha Oil Company, Wigwam Oil Company, Stevens Point Oil Company, and the Sachem Oil Company filed special pleas to the jurisdiction of the court upon the ground that neither the complainant nor these defendants were citizens or residents of the Eastern District of Oklahoma. The defendants Hugh Pitzer and Dana H. Kelsey also filed special pleas to the jurisdiction of the court, alleging that they are Indian superintendents, having charge, in behalf of the Secretary of the Interior and under his direct management and control, of the affairs of the Five Civilized Tribes of Indians, and that they were simply engaged in carrying out the policy and execution of the laws of the United States in its dealings with these Indians in their tribal property, and for that reason, although they are citizens of the state of Oklahoma and residents of the Eastern District, they are not subject to the jurisdiction of the courts.

The pleas to the jurisdiction of the defendants Bankers' Trust Company, Indian Territory Illuminating Oil Company, Hugh Pitzer, and Dana H. Kelsey were by the court sustained. The other defendants who had filed special pleas to the jurisdiction filed at a later day a general demurrer to the bill, and thereupon the special pleas were by the court overruled. At the hearing of the motion of defendants to dissolve the restraining order and that of complainant to grant a temporary injunction, the court announced its readiness to allow a temporary injunction upon certain conditions which complainant declined to accept, whereupon the temporary order was dissolved, and the application for the temporary injunction denied. The court, at the same time, also sustained the general demurrer filed by the defendants to the bill. That part of the decree reads as follows: "And the court thereupon announced that in view of the action of the plaintiff in declining to accept and consent to the conditions upon which the court proposed to grant the temporary injunction, and in view of the other holdings and findings of the court and actions of the plaintiff, the respective demurrers filed by the defendants Central Fuel Oil Company and subsidiary corporations will be sustained. Therefore be it ordered, adjudged, and decreed that the defendants' demurrers be sustained, the application of the plaintiff for a temporary injunction be denied, that the restraining order heretofore entered be dissolved, and the plaintiff's bill dismissed at the plaintiff's cost." From this decree and all interlocutory orders made by the court, by which the appellant felt aggrieved, this appeal is prosecuted.

As the final decree was rendered upon the demurrer to the sufficiency of the bill, it is advisable that the allegations in the bill, upon which it was sought to obtain specific performance of a contract, be set forth more fully than would otherwise be necessary.

The defendant the Central Fuel Oil Company, hereafter called the "Central Company," was a holding company. It held a majority of the stock of numerous corporations which had subleases of lands, some of which originally belonged to the Osage Indians, the Creek Indians, and the Cherokees, under which those companies were entitled to drill for and take oil from the land. Some of these leases were subject to restrictions, and others were free from such restrictions. The Central Company by virtue of its ownership and control of these subsidiary companies and the leases was enabled to produce large quantities of oil in the Bartlesville field, but there was only one method by which it could get this oil to the market, and that was by sale to the Prairie Oil & Gas Company, a subsidiary company of the Standard Oil Company,

that being the only company which had a pipe line in that territory. It was desirous of getting a pipe line into the Bartlesville field, so that it might transport its oil out without paying tribute to the Prairie Oil & Gas Company. The complainant, the Texas Company, was a refining company and the owner of pipe lines piping oil from Tulsa, Okl., and other regions to the Gulf of Mexico in the state of Texas, and the Central Company entered into negotiations with the Texas Company to procure an outlet for its oil.

The result of these negotiations was a contract between the two companies, the Texas Company and the Central Fuel Oil Company, made on June 13, 1910, by the terms of which it was agreed:

(1) The Central Company was to deliver to the Texas Company, and the latter agreed to receive, all crude petroleum which might be tendered by the Central Company from the property it owned or controlled by corporations, which were fully described, and also from other properties which the Central Company might then own, or thereafter acquire during the term of the contract in the Bartlesville or northern Oklahoma field, either directly or through ownership of a majority of the outstanding stock.

(2) The crude petroleum was to be of merchantable quality, and be delivered from the tanks owned or designated by the Central Company in the north Oklahoma field and subject to the customary and usual deduction in determining the quantity, and be of gravity not less than 30 degrees Beaume, but the Texas Company was not to be required to receive more than 20,000 barrels in any one day nor more than 540,000 barrels in any one month of 30 days. The Central Company also agreed that it would operate or cause to be operated all of the properties covered by the contract, and would tender all of the products realized from these properties up to the maximum stated.

(3) This paragraph provides that all the oil delivered to the Texas Company shall be carried in a separate account on the books of the company so that the quantity thereof may be readily identified. The Texas Company agreed that it would deliver to the Central Company or to its order an amount of merchantable fuel oil equal in quantity to the 50 per cent. of the crude petroleum it delivered to the Texas Company, the same to be charged against said account as 50 per cent. of the crude petroleum and for the remaining 50 per cent. the Texas Company is to pay the Central Company 89¼ cents per barrel, which price is predicated upon an arbitary basis of 42 cents per barrel for crude petroleum, which basis should continue for the first five years of the term of the contract. For the balance of the term of the contract the price to be paid by the Texas Company for said remaining 50 per cent. is to be regulated by the prevailing prices for crude petroleum in the oil field within the above limits from which said crude petroleum is taken, and be arrived at by adding to such price of 89¼ cents per barrel 1 cent for each 1 cent the prevailing price may advance above said 42 cents per barrel.

(4) Delivery points for the fuel oil shall be at Miller's Switch Station, south of Dallas, on the Houston & Central Railroad, and at Houston, Tex., on the Texas & New Orleans Railroad, the deliveries to be made free on board tank cars or in storage tanks to be furnished by the Central Company or its customers, but the Texas Company was to have the option, on emergency conditions preventing deliveries as above, of making the deliveries due at Miller's Switch Station, Tex., at Corsicana, Tex., and deliveries due at Houston, Tex., at Humble, Tex., and for all oil delivered at Houston or at Humble, Tex., the Texas Company was to be paid an additional allowance of 12½ cents per barrel.

(5) The Texas Company obligated itself to extend its pipe line system to the Central Company's oil fields as soon as possible, and not later than January 22, 1911.

(6) Settlement shall be had and payments made monthly, the Texas Company to charge the Central Company storage at the rate of 1 cent per barrel per month on all oils remaining more than 30 days, but the storage charge to apply only to balances exceeding 100,000 barrels, the Central Company to be charged and pay to the Texas Company for each month of the life of the contract the sum of $70,000.

(7) This paragraph refers to a loan of $3,000,000, which is more fully set out in another part of the contract.

(8) This paragraph makes provision for a mortgage to be executed by the Central Company to the Bankers' Trust Company for a loan of $6,000,000, a copy of which mortgage is filed as an exhibit to the bill. The paragraph also provides that the Texas Company shall have certain rights, remedies, and liens, described in section 7 of the mortgage, and that the Central Company shall also execute any other or further instrument that may be necessary to give full effect to that provision. It also provides that if the Texas Company should make any payment or incur any cost or expense in preventing or making good any defaults of the Central Company or its successors under said mortgage, or shall make any advances for the protection or benefit of the Central Company under said mortgage, the Central Company will pay to the Texas Company the amount of such payments, expenses, costs, and advances with 6 per cent. interest per annum, and to secure these payments, and also any other made for the purpose of discharging liens on the property, the Texas Company shall be entitled to all the rights, remedies, and liens granted by the mortgage to the Bankers' Trust Company.

(9) This paragraph provides that the remedies in paragraph 8 and also mentioned in the mortgage shall not be deemed exclusive, but the Texas Company shall be entitled at all times to exercise any remedy which it would be entitled to exercise if no such provision had been made in the mortgage. It is next provided that, in view of the great cost of the additional construction of pipe lines to the oil fields of the Central Company, that company agrees that it will loan or cause to be loaned to the Texas Company the sum of $3,-000,000, for which the Texas Company is to execute its notes and secure them by mortgage in the form contained in a draft attached to the contract.

(10) This paragraph provides that the contract shall be for 15 years from and after January 22, 1911, but by a later contract between the parties this was modified by reducing the life of the contract to ten years from that date.

The next two paragraphs provide how many gallons shall constitute a barrel and the temperature of the crude petroleum. They also except both parties from liabilities for any damages arising from strikes or other labor disturbances, invasions, insurrections, or acts of God.

(13) This paragraph specifies that this agreement shall be deemed to have superseded and shall take the place of every and any other instrument purporting to be an agreement between the parties hereto, heretofore entered into, signed, or delivered or purporting to have been signed or delivered upon behalf of said parties or either of them.

Exhibit 10 to the contract is a copy of the mortgage to be executed by the Central Fuel Oil Company to the Bankers' Trust Company. Article 7 of that mortgage, hereinbefore referred to, provides that if default shall be made in the payment of the principal or interest upon any of the loans secured by the mortgage when the same shall become due and payable, or in the prompt performance of any of the covenants, conditions, or agreements in the mortgage or bonds, the Texas Company shall have the right, if it so elect, to make any payment or perform or cause to be performed any act as to which such default shall have occurred, and thereupon it shall succeed to and possess a lien upon all of the property and assets of the company for the amount of money expended or for the expenses or costs of making good any such default, which lien, however, shall be subject always to the priority of the lien of the holders of the bonds.

The bill then sets out the shares of stock of the subsidiary companies owned at the time by the Central Company. Of most of these subsidiary companies the Central Company owned practically all of the stock and a majority of the capital stock of all of them. The contract made between the Texas Company and the Central Company was ratified by all the subsidiary companies and adopted as their own, so far as it affected them. The $6,000,000 mortgage to the Bankers' Trust Company was duly executed dated July 15, 1910, which was after the contract made between the Texas Company and the Central Company. At the time the contract was entered into, the Texas Company owned and operated three refineries in the state of Texas, as mentioned in the contract, and was constructing a fourth refinery at West Tulsa, in the state of Oklahoma. It had a pipe line system extending from the seaboard across the state of Texas into the state of Oklahoma and to the locality of the

place where the refinery was being built, but it had no pipe line system to the Bartlesville or north Oklahoma field where the oil wells of the Central Company were, and for this reason was not a buyer of oil in said locality. Immediately after the execution of the contract, and on the faith thereof, it promptly and with all reasonable speed extended its pipe line system to said Bartlesville field and established adequate gathering stations and other facilities which would enable it to perform its obligation under said contract, completing the same prior to the 22d of January, 1911. It expended under said contract in improvements and extensions about $700,000, they being necessarily of a permanent nature, but of little value to complainant, unless this contract is carried into effect by the Central Company. During the year 1910 the oil production in the locality reached by complainant's pipe line system greatly declined, and, if it cannot obtain the oil from defendant for which it had contracted, its pipe lines and refineries must remain idle to a great extent, as oil cannot be obtained elsewhere. After the execution of this contract, on the 6th day of January, 1911, a question having arisen as to the determination of what properties were in fact owned by the Central Company and its subsidiaries, and some of the oil coming from leases which required the payment of royalties, an additional agreement was entered into between these parties, whereby it was provided that each subsidiary company within the operation of the contract should execute and file with the Texas Company at Tulsa, Okl., a certificate authorizing the Texas Company to receive the oil and pay for it as directed by the owners. It was also provided that abstracts and evidences of title were to be furnished to the Texas Company showing the ownership of the oil and upon failure to furnish such evidences of title, or, in the event of a dispute concerning the title, the Texas Company was to retain the money until satisfactory indemnity was furnished. Forms for these abstracts of titles and transfer orders were prepared and were to be executed and furnished by the Central Company to the Texas Company before payment was to be made for the oil delivered. After the first pipe line had been completed, the Texas Company, at the request of the Central Company and its subsidiaries, laid other branches and lines of pipe in said fields to reach the different wells at an expense of several thousand dollars. In several instances the Central Company has failed to furnish complainant satisfactory abstracts and other evidence of title or satisfactory indemnity except as to a portion of the land and leases embraced in the contract. Some of the abstracts and evidences of title disclosed serious defects and infirmities of title and for this reason these oils have not been paid for; but the money for this oil is kept separately for the purpose of paying for it as soon as the title is ascertained. Up to May 1, 1911, the Central Company had furnished to complainant in the state of Oklahoma from its lands 708,567.76 barrels of oil, and of this oil the complainant has delivered at the request of the Central Company at Miller's Switch Station, near Dallas, Tex., 393,366.23 barrels of fuel oil of the gravity required by the contract, and is ready to continue in the future to take the crude oil from said lands, and deliver the fuel oil in Texas as provided in the contract. The oil from some of the wells described in the bill is on Indian reservations, for which royalties must be paid. These Indian owners are under the control of the Indian superintendents who are made defendants in this cause for that reason.

The bill then sets out various amounts of money due it from the Central Company and also the $70,000 per month as provided in the contract, which sums it has credited on the amounts due from it to the Central Company; that the $3,000,000 loan was obtained by the Central Company for complainant, for which it executed its notes and a mortgage on its (complainant's) property; that these notes are in the hands of other parties, who purchased them for value, so that the indebtedness due the complainant from the Central Company cannot be set off against them but has to be paid by the complainant to the holders of the notes as they mature; that the Central Company is wholly insolvent; that all of its property is mortgaged for more than its value, and it has no property subject to execution in case of a judgment against it; that it now refuses to carry out its contract, and has informed complainant that it will disconnect its oil wells from complainant's pipe line, and that it will procure its $6,000,000 mortgage to be foreclosed and a receiver

for itself and its oil properties to be appointed; that it will probably cease to carry on its operations and leave complainant helpless; that complainant has no adequate remedy at law, and for that reason has to apply for relief to a court of equity. The prayer of the bill is that an injunction be issued enjoining the defendant the Central Company, and its subsidiaries, from disconnecting complainant's pipe lines or shutting off any wells or in any manner interfering with it in running oil from any of the lands or leases mentioned in the bill or from in any wise violating the contract or any of the provisions thereof; that a receiver be appointed to take charge of the property of the defendants, and to perform such duties as may be necessary for the preservation of the right to produce and take oil from said lands and for a full and complete performance of the contract and the protection of complainant's rights thereunder. It then prays for a discovery as to the subsidiary companies, and that upon final hearing there be a decree for the specific performance of the contract and that the lien of the Bankers' Trust Company under the mortgage be subordinated to complainant's rights.

A. L. Beaty. (Jas. L. Autry and F. B. Dillard, on the brief), for appellant.

Louis Marshall and George S. Ramsey (James A. Veasey, on the brief), for appellees other than Dana H. Kelsey and Hugh Pitzer.

William J. Gregg, U. S. Atty., for appellees Dana H. Kelsey and Hugh Pitzer.

Before SANBORN and HOOK, Circuit Judges, and TRIEBER, District Judge.

TRIEBER, District Judge (after stating the facts as above).    [1] If the sole object of the bill of complaint is to obtain a decree for specific performance of the contract for the delivery of the oil, the proceeding would be one in personam, and such an action, in the absence of a statute conferring jurisdiction in rem, would not be local, but transitory, and could be maintained in any court having jurisdiction of the person of the defendant. Penn v. Baltimore, 1 Ves. Sr. 444; Massie v. Watts, 6 Cranch, 148, 3 L. Ed. 181; Orton v. Smith, 18 How. 263, 15 L. Ed. 393; Hart v. Sansom, 110 U. S. 151, 154, 3 Sup. Ct. 596, 28 L. Ed. 101; Pennoyer v. Neff, 95 U. S. 714, 723, 25 L. Ed. 565; Phelps v. McDonald, 99 U. S. 298, 25 L. Ed. 473; Cole v. Cunningham, 133 U. S. 107, 118, 10 Sup. Ct. 269, 33 L. Ed. 538; Arndt v. Griggs, 134 U. S. 316, 320, 10 Sup. Ct. 557, 33 L. Ed. 918; Western Union Tel. Co. v. Pittsburgh, etc., R. R. Co. (C. C.) 137 Fed. 435.

[2] But by the provisions of article 7 of the mortgage to the Bankers' Trust Company complainant is entitled to a lien on all the premises mortgaged, subject to that of the trust company, not only for any moneys it might pay to protect the property against defaults under the mortgage or by releasing any judgment or attachment liens, but also in case of any default by the Central Company in the performance of any of the obligations of the Company under the contract with the Texas Company. This, in effect, gives the Texas Company a second mortgage upon all that property with the right to enforce that mortgage in a court of equity. That such a lien may be enforced, under section 8 of the judiciary act of March 3, 1875, in the Circuit Court of the United States for the district in which the property is situated regardless of the residence of the parties, provided the proper diversity

of citizenship exists, is well settled. Greeley v. Lowe, 155 U. S. 58, 15 Sup. Ct. 24, 39 L. Ed. 69; Dick v. Foraker, 155 U. S. 404, 15 Sup. Ct. 124, 39 L. Ed. 201. For these reasons, the court below erred in sustaining the special pleas of the defendants Bankers' Trust Company and Indian Territory Illuminating Oil Company.

[3] As to the defendants Sagamore Oil & Gas Company, Waukesha Oil Company, Stevens Point Oil Company, and Sachem Oil Company, by filing general demurrers to the sufficiency of the bill, they waived their privilege of not being subject to this action in a national court in the state of Oklahoma even had it existed. Western Loan Company v. Boston C. M. Co., 210 U. S. 368, 28 Sup. Ct. 720, 52 L. Ed. 1101. In that case the defendant filed its demurrer to the complaint, alleging, first, that the court had no jurisdiction of the subject of the action; second, that the court had no jurisdiction of the person of the defendant; third, that said complaint did not state facts sufficient to constitute a cause of action against the defendant; fourth, that the complaint was uncertain; fifth, that the complaint was unintelligible. Neither the plaintiff nor the defendants were at the time of the institution of the suit citizens or residents of the state of Montana (the suit having been instituted in the United States Circuit Court for the District of Montana), but it was held that as diversity of citizenship existed so that the suit was cognizable in some national court, the objections to the jurisdiction of the particular court in which the suit was brought might be waived by appearing and pleading to the merits, and interposing a demurrer going to the merits as well as to the jurisdiction of that particular court amounted to such a waiver. Other cases to the same point are In re Moore, 209 U. S. 490, 28 Sup. Ct. 585, 52 L. Ed. 904; Ingersoll v. Coram, 211 U. S. 335, 29 Sup. Ct. 92, 53 L. Ed. 208; Shanberg v. Fidelity & Casualty Co., 158 Fed. 1, 85 C. C. A. 343, 19 L. R. A. (N. S.) 1206; McPhee & McGinnity Co. v. Union Pacific R. R. Co., 158 Fed. 5, 87 C. C. A. 619; Logan & Bryan v. Postal Telegraph Co. (C. C.) 157 Fed. 570.

[4] But, aside from that fact, neither of these last-named defendants have appealed from the order of the court overruling their pleas. The question whether the special pleas to the jurisdiction were erroneously overruled is therefore not presented here. In O'Neill v. Wolcott Mining Co., 174 Fed. 527, 98 C. C. A. 309, 27 L. R. A. (N. S.) 200, this court, citing numerous authorities to sustain the conclusion reached, said:

"An appellee or defendant in error who takes no appeal or writ of error himself cannot, by assigning cross-errors or by brief or argument, confer jurisdiction upon a federal appellate court to consider, review, or decide rulings against him in the court below."

[5] The pleas of the defendants Pitzer and Kelsey to the jurisdiction were erroneously sustained. Their pleas are that they are officers of the United States, and the action against them is in effect a suit against the United States. Such officers are not exempt from the process of the court nor from its injunction in case they should undertake to do any act not authorized by law; nor is such an action one against the United States. The courts have jurisdiction to determine

whether the acts of officers in any particular case are in pursuance of authority conferred on them by the acts of Congress or the head of a department. Noble v. Union River Logging R. R. Co., 147 U. S. 172, 13 Sup. Ct. 271, 37 L. Ed. 123; Grisar v. McDowell, 6 Wall. 363, 18 L. Ed. 863; Butterworth v. United States ex rel., 112 U. S. 50, 5 Sup. Ct. 25, 28 L. Ed. 656; Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932; Garfield v. Goldsby, 211 U. S. 249, 29 Sup. Ct. 62, 53 L. Ed. 168; Western Union Telegraph Co. v. Andrews, 216 U. S. 165, 30 Sup. Ct. 286, 54 L. Ed. 430; Wadsworth v. Boysen, 148 Fed. 771, 78 C. C. A. 437.

So far as the allegations of the bill show, the duties of these defendants are only to secure and protect the rights of the Indian lessors by collecting the royalties due them. The question in issue in this cause, in so far as it affects these defendants, is not whether the court has the power to enjoin them from doing lawful acts, but whether they are proper parties in view of the interests of the Indians who are the owners of the lands leased, and for whose protection these officers are acting. Although they are not indispensable, nor even necessary, parties, they are proper parties, and the mere fact that they are employés or officers of the government does not exempt them from being made parties in an action of this nature. But, even if the special pleas of all the parties who filed them should have been sustained, it would not affect the power of the court to proceed with the cause so far as the other defendants are concerned. The rule of law is well settled that only the absence of indispensable parties will deprive a court of equity of the power to proceed against the other defendants. Proper parties, or even necessary parties, may be dispensed with, but the decree will not affect their rights. Payne v. Hook, 7 Wall. 425, 19 L. Ed. 260; Hotel Company v. Wade, 97 U. S. 21, 24 L. Ed. 917; Carrau v. O'Calligan, 125 Fed. 657, 60 C. C. A. 347, affirmed sub nom. Farrell v. O'Brien, 199 U. S. 89, 25 Sup. Ct. 727, 50 L. Ed. 101; Geer v. Mathieson Alkali Works, 190 U. S. 428, 23 Sup. Ct. 807, 47 L. Ed. 1122; Cella, Adler & Tilles v. Brown (C. C.) 136 Fed. 439, affirmed 144 Fed. 472, 75 C. C. A. 608; Rogers v. Penobscott Mining Co., 154 Fed. 606, 83 C. C. A. 380.

[6] Neither of these defendants is an indispensable party to this proceeding and the subsidiary companies are not even necessary parties, for the Central Company, as the holder of the majority of their stock, has control of them, and a decree against it will grant all the relief complainant prays. Union Pacific Ry. Co. v. Chicago, etc., Ry. Co., 163 U. S. 564, 592, 16 Sup. Ct. 1173, 41 L. Ed. 265. Equity Rule 47 (29 Sup. Ct. xxxi) expressly provides for cases of this nature.

[7] Did the court err in sustaining the demurrer to the bill? On behalf of the appellee, it is urged that there is no equity in the bill for several reasons. First, it is argued that complainant has a complete and adequate remedy at law by an action for damages for breach of the contract. It is true that a court of equity will not assume jurisdiction of a cause, and especially one for specific performance, if the complainant has a complete and adequate remedy at law. But to have this effect it is not sufficient that there be a remedy at law. It must

be plain and adequate, and as certain, prompt, complete, and efficient to attain the ends of justice and its prompt administration as the remedy in equity. Boyce v. Grundy, 3 Pet. 210, 7 L. Ed. 655; Watson v. Sutherland, 5 Wall. 74, 18 L. Ed. 580; Davis v. Wakelee, 156 U. S. 680, 15 Sup. Ct. 555, 39 L. Ed. 578; Walla Walla v. Walla Walla Water Works, 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341; Smith v. Bank, 89 Fed. 832, 32 C. C. A. 368; Castle Creek Water Co. v. Aspen, 146 Fed. 8, 76 C. C. A. 516; Farwell v. Colonial Trust Company, 147 Fed. 480, 78 C. C. A. 22.

[8] The allegations in the bill which the demurrer admits to be true show clearly that the remedy at law is entirely inadequate to grant the relief to which the complainant may be entitled. There are several aspects in which this appears. It is charged that the Central Company is insolvent, and that all of its property is now covered by a mortgage to secure an indebtedness in excess of its value. While there is high authority for holding that insolvency alone may sometimes be a cause for equitable interference, it is unnecessary to determine that question in this case, but we do hold that insolvency is a circumstance to be considered in connection with the other allegations in the bill for the purpose of determining whether there is a complete and adequate remedy at law. McNamara v. Home Land & Cattle Co. (C. C.) 105 Fed. 202. In many instances insolvency alone will justify the interposition of a court of equity otherwise cognizable only in a court of law. Injunctions are often granted against trespassers solely upon the ground of insolvency. Prof. Pomeroy, in his work on Equity Jurisprudence, says on that subject:

"The inadequacy of legal remedies ordinarily against an insolvent trespasser is obvious, and the reason for equity's intervention in such cases is clear. The number of cases in which the defendant's insolvency is made a material part of the court's reason for granting an injunction is very great. The number of cases in which the question has arisen whether insolvency alone is enough to support it is not so large, but it is sufficient to show the general recognition by the courts of the glaring insufficiency of a judgment for damages against an insolvent." 5 Pomeroy, Eq. Jur. § 497.

But, aside from the question of insolvency, an action at law for damages would not enable complainant to recover all damages it may suffer by reason of the breach of contract. The damages in this case are impossible of proof. No one can say what amount of oil the Central Company will or can produce during the life of the contract by a conscientious attempt to comply with it. It is a well-known fact, of which courts are bound to take judicial notice, that oil is fugacious, and may be drawn away by strangers through other wells. The flow of the wells decreases in the course of years, and long before the expiration of this contract these wells may become entirely dry. Any damages awarded would be wholly speculative and uncertain, and without any possibility of sufficient legal proof to sustain the judgment. Wilkinson v. Colley, 164 Pa. 43, 30 Atl. 286, 26 L. R. A. 114; McCornick v. United States Mining Co., 185 Fed. 748, 108 C. C. A. 86, and authorities there cited; Peale v. Marian Coal Co. (C. C.) 190 Fed. 376, 388.

If, as suggested, successive actions for the damages suffered may be instituted upon the expiration of certain fixed periods, when the amount of oil taken from the wells during the preceding period has been ascertained, there would necessarily have to be a multiplicity of suits, to avoid which the intervention of a court of equity is certainly proper. Bank of Kentucky v. Schuylkill Bank, 1 Pars. Eq. Cas. (Pa.) 180; Peale v. Marian Coal Co. (C. C.) 172 Fed. 639.

In addition to these considerations, it appears from the bill, and the contract between the parties establishes it, that one of the main inducements to this contract was to enable the complainant, by obtaining the crude oil, to utilize the three refineries it then owned and had in operation in the state of Texas and one it was then constructing in the state of Oklahoma; and to enable the Central Company, which at that time could only dispose of the oil produced from its wells through a sale to the Prairie Oil & Gas Company, to make sales of its products to other companies and obtain the benefit of competitive prices. For this purpose, it was necessary for the Central Company to have pipe lines extended to its oil fields and to be connected with lines extending to places where there was a market for its crude oils. One of the provisions of the contract was:

"The Texas Company agrees that it will promply and with all reasonable speed extend its pipe line system to Bartlesville or the north Oklahoma field, as above described, and will establish an adequate gathering system and related facilities as will enable it to perform the duties of this contract, such to be completed nor later than January 22, 1911."

The bill charges that complainant built this pipe line and erected tanks and installed pumping stations necessary to carry out the provisions of the contract at an expense of $700,000, that these improvements are of a permanent nature, and, unless the oil thus contracted for is delivered to it, this pipe line and pumping stations are of but little value, if any, and the cost thereof practically lost. These facts clearly exclude a conception that an action at law will afford a complete and adequate remedy.

In Watson v. Sutherland, supra, an injunction was sought to restrain the levy of an execution on a stock of merchandise claimed by the plaintiff to be his property, and not that of the execution debtors. Objection was made that there was a complete remedy at law by an action of trespass against the sheriff and the execution creditors. In overruling this objection the court said:

"If the appellants made the levy and prosecuted it in good faith, without circumstances of aggravation, in the honest belief that Wroth and Fullerton owned the stock of goods, and it should turn out, in an action at law instituted by Sutherland for the trespass, that the merchandise belonged exclusively to him, it is well settled that the measure of damages, if the property were not sold, could not extend beyond the injury done to it, or, if sold to the value of it, when taken, with interest from the time of the taking down to the trial. And this is an equal rule, whether the suit is against the marshal or the attaching creditors, if the proceedings are fairly conducted, and there has been no abuse of authority. Any harsher rule would interfere to prevent the assertion of rights honestly entertained, and which should be judicially investigated and settled. 'Legal compensation refers solely to the injury done to the property taken, and not to any collateral or consequential damages, resulting to the owner by the trespass.' Loss of trade, destruction of credit,

and failure of business prospects are collateral or consequential damages which, it is claimed, would result from the trespass, but for which compensation cannot be awarded in a trial at law. Commercial ruin to Sutherland might, therefore, be the effect of closing his store and selling his goods, and yet the common law fails to reach the mischief. To prevent a consequence like this, a court of equity steps in, arrests the proceedings in limine, brings the parties before it, hears their allegations and proofs, and decrees, either that the proceedings shall be unrestrained, or else perpetually enjoined. The absence of a plain and adequate remedy at law affords the only test of equity jurisdiction, and the application of this principle to a particular case must depend altogether upon the character of the case as disclosed in the pleadings. In the case we are considering it is very clear that the remedy in equity could alone furnish relief, and that the ends of justice require the injunction to be issued."

[9] It is also contended that specific performance is not the proper remedy to enforce a contract affecting personal property. When an action for damages is adequate, a court of equity is without jurisdiction. As hereinbefore shown, however, such an action would not afford complainant in this case adequate relief. It is now well settled that, when the chattels are such that they are not obtainable in the market, or can only be obtained at great expense and inconvenience, and the failure to obtain them causes a loss which could not be adequately compensated in an action at law, a court of equity will decree specific performance. Equitable Gaslight Co. v. Baltimore Coal Tar & Mfg. Co., 63 Md. 285; Gloucester Isinglass & Glue Co. v. Russia Cement Co., 154 Mass. 92, 27 N. E. 1005, 12 L. R. A. 563, 26 Am. St. Rep. 214; Offutt v. Offutt, 106 Md. 236, 67 Atl. 138, 12 L. R. A. (N. S.) 232, 124 Am. St. Rep. 491; Harris v. Perry, 215 Pa. 174, 64 Atl. 334; Richmond v. Dubuque, etc., R. R. Co., 33 Iowa, 480; Chehak v. Battles, 133 Iowa, 107, 110 N. W. 330, 8 L. R. A. (N. S.) 1130; Law v. Smith, 68 N. J. Eq. 81, 59 Atl. 327; Newton v. Wooley (C. C.) 105 Fed. 541.

[10] From the allegations in the bill it appears that crude oil cannot as a rule be purchased in the open market, but, to obtain it, the refining and pipe line companies must extend their pipes at enormous expense to the oil fields, assuming that the oil fields can be found. It is charged that in 1910 the oil production in the localities reached by complainant's pipe line system had greatly declined, and is still declining; that this was one of the vital considerations leading to the execution of the contract by the complainant; that other pipe line companies have acquired and obtained control of large acreages, if not practically of all producing and prospective oil lands and leases in those localities; and, if said contract is not specifically performed, complainant charges its pipe lines and refineries will remain idle to that extent.

In Equitable Gaslight Co. v. Baltimore Coal Tar & Mfg. Co., specific performance was decreed on a contract to sell coal tar which plaintiff needed in order to fulfill existing contracts and which it was impossible to obtain otherwise than by purchasing in distant cities and transporting the same at great expense. In Gloucester Isinglass & Glue Co. v. Russia Cement Co. specific performance was decreed of a contract to furnish fish skins to be used in the manufacture of glue. It appeared that fish skins were of very limited production; that most

of the producers were under contract; and that, unless relief were given by specific performance, it would be very difficult, if not impossible, for the complainant to carry on its business. The equities in those cases were no stronger than those in this case.

It is next urged that the bill shows that the complainant had failed to make payments for the crude oil delivered to it by the Central Company in compliance with the terms of the contract, and this failure, it is insisted, was such a breach of the contract as justifies the defendant to treat it as no longer in force, and denies complainant's entrance into a court of equity to demand specific enforcement or any other equitable relief. It is true the bill shows complainant had not paid for all the crude oil received by it from the Central Company, but it also shows that the reason therefor was the failure of the Central Company to furnish, as a condition precedent to receiving, the division orders, and the abstracts or other evidence of title to some of the lands, or execute satisfactory indemnity as required by the supplemental agreement executed on January 6, 1911, and that complainant "stands ready and willing to pay the balance due and owing by it as soon as the proper division orders are filed and good title showings are made, or it is determined said defendant has good title to the oil and is entitled to payment, or, if necessary, it will deposit the money in court or pay the same over to a receiver." As courts of equity may prescribe terms upon which temporary injunctions are granted the court below had the right to require, and as shown by the record it did require, complainant to pay the moneys for which proper abstracts had been filed before the hearing, and it did pay the same. Upon these allegations, which the demurrer admits to be true, the failure of complainant to pay the money was justified, and not a breach of the contract; and is no reason for refusing any equitable relief it may otherwise be entitled to.

[11] It is next contended that the contract in respect to which relief is sought extends over a period of 10 years, necessitating supervision for a long time in a manner which a court of equity will not undertake. The leading cases on which appellees rely to sustain this proposition are Marble Co. v. Ripley, 10 Wall. 339, 19 L. Ed. 955; Texas & Pacific R. R. Co. v. City of Marshall, 136 U. S. 393, 10 Sup. Ct. 846, 34 L. Ed. 385; Javierre v. Central Antragracia, 217 U. S. 502, 30 Sup. Ct. 598, 54 L. Ed. 858; Berliner Gramaphone Co. v. Seaman, 110 Fed. 30, 49 C. C. A. 99; Shubert v. Woodward, 167 Fed. 47, 92 C. C. A. 509; Lone Star Salt Co. v. T. S. L. Ry. Co., 99 Tex. 434, 90 S. W. 863, 3 L. R. A. (N. S.) 828; Edelen v. Samuels & Co., 126 Ky. 295, 103 S. W. 360, 31 Ky. Law Rep. 731. A careful examination of the facts and the opinions of the courts in these cases is necessary to determine to what extent they are applicable to the facts in this cause as shown by the bill.

In the Marble Company Case the contract, as stated by the court, required of the owners a perpetual supply of marble and involved "skill, personal labor and cultivated judgment." Upon these facts it was held:

"If performance be decreed the case must remain in court forever, and the court to the end of time may be called upon to determine, not only whether

the prescribed quantity of marble has been delivered. but whether every block was from the right place, whether it was sound, whether it was of suitable size, or shape, or proportions."

The contract sought to be enforced in this case runs for 10 years only, and involves no "skill, personal labor, and cultivated judgment." What it does require is easily ascertainable, and, if carried out in good faith, ought not to give rise to any disputes requiring the interposition of the court. During the time it was complied with by appellee no disputes arose, and there is no reason for anticipating any now if good faith will control the actions of both parties. That some differences may occur is true, but they are not likely to be of a nature requiring much consideration. No one will question for a moment the duty of a court of equity specifically to enforce a lease of ground for a term of ten years or even a term of 99 years because the lessee is bound by certain covenants such as paying rents, taxes, and assessments, keeping the buildings in repair or erecting buildings according to certain specifications, keeping the buildings insured and other conditions usually inserted in such contracts of lease, and which may give rise to as many or more disputes than the contract in the case at bar.

Texas Pacific Ry. Co. v. City of Marshall was in effect determined upon the ground that, under the circumstances of that case, the word "permanent" in the contract was complied with by the establishment of the terminus and the offices and shops contracted for and not mentioned at the time of removing and abandoning them at a later day, and having kept them there for eight years, until the interests of the railway company and of the public demanded their removal to some more suitable place. Another reason assigned by the court for its judgment was that the city had a complete and adequate remedy at law for damages which could be determined in one action. As to the supervision necessary, if specific performance were decreed, the opinion of the court shows clearly why a court could not undertake it in that case by saying:

"If the court had rendered a decree restoring all the offices and machinery and appurtenances of the road which had been removed from Marshall to other places, it must necessarily superintend the execution of this decree. It must be making constant inquiry as to whether every one of the subjects of the contract which has been removed has been restored. It must consider whether this has been done perfectly or in good faith or only in an evasive manner. It must be liable to perpetual calls in the future for like enforcement of the contract, and it assumes, in this way, an endless duty, inappropriate to the functions of the court which is as ill-calculated to do this as it is to supervise and enforce a contract for building a house or building a railroad, both of which have in this country been declared to be outside of its proper function, and not within its powers of specific performance."

In the Javierre Case the decree of the lower court was reversed upon two grounds, neither of which exists in this case. The court held that an action at law for damages would have granted all the relief complainant was entitled to, and also that there was a want of mutuality as no injunction could have been granted against the appellee.

In the Gramaphone Case the parties, when they executed the contract, realized that it would probably give rise to many disputes, and therefore expressly provided for the appointment of a disinterested arbiter to settle any disputes regarding the interpretation of the contract. The meaning of the articles contracted for was doubtful, and the contract itself undertook to define the phrase "gramaphone and gramaphone goods" as intended by the use of the words in the contract.

The Shubert Case was decided mainly upon two grounds: First, that there was a want of mutuality; and, second, that the terms of the contract would necessarily entail upon the court through many years the supervision and direction of a continuous series of acts, many of them requiring skill and cultivated judgment. As enumerated by the court, some of these were:

"What bookings for a theater should be approved or disapproved; how many and what persons should be employed to operate the theater; how the intricate details of the theater should be conducted; how its operation should be advertised, and many other unforeseen issues which the complicated performances contemplated cannot fail to raise."

But the court took occasion to say further:

"It is conceded that a court of equity has ample power to determine all these questions and to conduct this business by its receiver, or master, and that it will sometimes enforce the performance of contracts where the performance involves more intricate details or longer periods of time where the other equities of the complainant in the case, or the public interest are controlling."

In the Lone Star Salt Company Case the contract was one which made special provision for compensation in case of a breach, and it was held that specific performance should therefore not be decreed as there was a complete remedy at law. The court then proceeded:

"While we have thought it proper to put the decision upon the construction of the contract, which is held to be the true one, we may say that the same result will follow either construction. The injunction to the defendant to deliver the freight as it accrues finally settles nothing, amounting to nothing more than a command to carry out the contract, leaving undetermined the particular acts to be done to constitute performance. In what quantities and at what interval of time is the tonnage to be furnished as it accrues? How is the defendant's action in executing the order to be affected by the condition of plaintiff's business, existing at different times, in respect to its readiness or unreadiness to receive and promptly transport? How will the defendant at any given time be enabled to determine how much of its outgoing freight must be delivered, as it accrues, to compensate for any deficiency in percentage of incoming freight received and carried by plaintiff? These and many other questions that might be presented expose the futility of the attempt to define in advance the course of conduct the defendant must pursue in order to obey the mandate of the court. The truth is, the contract is of such a nature that, under any construction, the remedy of specific performance cannot specifically be applied to it. What would constitute a violation of the decree could only be determined by future actions of the court in further proceedings to define its scope and meaning, and to enforce it."

No such obstacles are to be surmounted in this case. Defendants contracted for all the oil, not exceeding 540,000 barrels for any one month of 30 days. It had the pipe lines to carry that amount, and there was no question of any incoming freight.

In Edelen v. Samuels & Co. the contract was of such a nature that,

if specifically enforced, it would require the court's constant attention for a period of at least five years.   As stated by the court:

"In order to make the whisky contemplated by the terms of the instrument before us, the court will be forced to purchase a large quantity of grain and other material necessary to the distillation of the spirits to be delivered; also to erect a bottling works, and be prepared to bottle the whisky after it is made."

There are no such facts in this case.   The court, in the same case, speaking of the distinction said to exist between contracts involving realty and that involving personal property, so far as the remedy of specific performance is concerned, said:

"The right to a decree of specific performance of a contract is based upon the equitable principle that the ordinary common-law remedy of damages for a breach will not afford defendant an adequate remedy from the injury arising from the failure to carry out its terms.   It is true that generally mere damages will more uniformly be found to fail as an adequate remedy in contracts relating to realty than those relating to personalty; yet, where the specific enforcement of a contract concerning personalty is practicable, and the remedy sounding in damages is found to be inadequate, the chancellor would just as readily enter a decree for its specific performance as he would in a contract concerning real property.   And, while the remedy of specific performance is generally spoken of as issuing in the discretion or grace of the chancellor, this is more a form of expression than of actual definition of the rights of the injured party as to his remedy by specific performance.   In other words, while the chancellor has a discretion, it is not an arbitrary but a legal discretion."

Many other cases are cited by the learned counsel for appellees to this point.   All of them have been carefully examined, and are as distinguishable upon the facts as those above cited.   Some of them apply to construction contracts requiring skill and judgment.   In others the parties can be compensated in an action at law; while some, sustaining appellee's contention to some extent rely upon cases determined long ago, overlooking the fact that equitable remedies have steadily been expanded by the court to meet the increased complexities of modern business relations.   The leading cases in the national courts sustaining the right of having specific performance decreed in cases of this nature, although it may necessarily result in the court retaining the cause to settle questions which may arise under the contract thereafter, are Joy v. St. Louis, 138 U. S. 1, 11 Sup. Ct. 243, 34 L. Ed. 843, affirming the decision of Judge, afterwards Mr. Justice Brewer, in Central Trust Co. v. Wabash, St. L. & P. Ry. Co. (C. C.) 29 Fed. 546; Union Pacific Railway Co. v. Chicago, etc., Ry. Co., 163 U. S. 564, 16 Sup. Ct. 1173, 41 L. Ed. 265, affirming the decision of the Circuit Court of Appeals for this Circuit in 51 Fed. 309, 2 C. C. A. 174, which had affirmed Mr. Justice Brewer's decision in Chicago, R. I. & P. Ry. Co. v. Union Pac. Ry. Co. (C. C.) 47 Fed. 15.

In the Joy Case Mr. Justice Blatchford, who delivered the unanimous opinion of the court, in reply to a contention similar to that of the instant case, said:

"In the present case it is urged that the court will be called upon to determine from time to time what are reasonable regulations to be made by the Wabash Company for the running of its trains upon its tracks by the Colorado Company.   But this is no more than a court of equity is called upon to

do whenever it takes charge of the running of a railroad by means of a receiver. Irrespective of this, the decree is complete in itself and disposes of the controversy; and it is not unusual for a court of equity to take supplemental proceedings to carry out its decree and make it effective under altered circumstances."

In Union Pacific Railway Co. v. Chicago, etc., Ry. Co., where the contract sought to be enforced was for 999 years, Mr. Chief Justice Fuller, speaking for the court sustaining a decree for specific performance, said:

"But it is objected that equity will not decree specific performance of a contract requiring continuous action involving skill, judgment, and technical knowledge, nor enforce agreements to arbitrate, and that this case occupies this attitude. We do not think so. The decree is complete in itself, is self-operating, and self-executing; and the provision for referees in certain contingencies is a mere matter of detail, and not of the essence of the contract. It must not be forgotten that in the increasing complexities of modern business relations equitable remedies have necessarily and steadily been expanded, and no inflexible rule has been permitted to circumscribe them. As has been well said, equity has contrived its remedies, 'so that they shall correspond both to the primary right of the injured party, and to the wrong by which that right has been violated,' and 'has always preserved the elements of flexibility and expansiveness, so that new ones may be invented, or old ones modified, in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition in which new primary rights and duties are constantly arising and new kinds of wrong are constantly committed.' Pomeroy, Eq. Jur. § 111."

Judge Brewer, in his opinion in the Circuit Court in Central Trust Company v. Wabash, etc., R. R. Co., said on that subject:

"It is true that such a decree cannot be executed by the performance of a single act. It is continuous in its operation. It requires the constant exercise of judgment and skill by the officers of the corporation defendant; and therefore, in a qualified sense, it may be true that the case never is ended, but remains a permanent case in the court, performance of whose decree may be the subject of repeated inquiry by proceedings in the nature of contempt. It is also true that in the changing conditions of business the details of the use may require change. The time may come when the respondents' business may demand the entire use of its tracks and the intervener's rights wholly cease. But other decrees are subject to modification and change, as in decrees for alimony. The courts are not infrequently called upon to modify them by reason of the changed condition of the parties thereto. So, when a decree passes in a case of this kind, it remains as a permanent determination of the respective rights of the parties, subject only to the further right of either party to apply for a modification upon any changed condition of affairs; and, so far as any matter of supervision of the personal skill and judgment of the officers of the respondent corporation, the contract, in terms, provides that the regulations of the running of trains shall be subject to the control of the officers of the respondent. While I concede that there is force in the objection that this must remain, in a qualified sense, a continuing case in the courts, with a constant duty of supervising the acts of the respondent, yet it seems to me that, where there is a right, there must be a remedy, and that the mere machinery of court procedure is flexible enough to adapt itself to the necessity of protecting a right. Clearly a mere action for damages would be a grossly inadequate remedy." 29 Fed. 558.

In the Rock Island Case the same learned justice said:

"I know to one who is only familiar with the narrow limits and the strict lines within and along which courts of law proceed the act of a court of equity in taking possession of a contract running for 999 years, and decreeing its specific performance through all those years seems a strange exercise

of power; but I believe most thoroughly that the powers of a court of equity are as vast and its process and procedure as elastic as all the changing emergencies of increasingly complex business relations and the protection of rights can demand." 47 Fed. 26.

While it is true, as contended by counsel for appellees, that these cases relate to contracts between railroads and therefore might have been sustained upon the ground of the interests of the public, there are other cases in no wise affected by public exigency, especially where violations of the decree could only occur infrequently and each violation would be a single complete act. Franklin Telegraph Co. v. Harrison, 145 U. S. 459, 12 Sup. Ct. 900, 36 L. Ed. 776; Hackett v. Hackett, 67 N. H. 424, 40 Atl. 434; Chubb v. Peckham, 13 N. J. Eq. 207; Livesley v. Johnston, 45 Or. 30, 76 Pac. 13, 746, 65 L. R. A. 783, 106 Am. St. Rep. 647; St. Regis Paper Co. v. Santa Clara Lumber Co., 173 N. Y. 149, 65 N. E. 967.

Prof. Pomeroy, the editor of the last edition of Pomeroy's Equity Jurisprudence, in his article on the subject of specific performance, published in the Encyclopedia of Law & Procedure, after discussing this subject and referring to the authorities, says:

"But in a remarkable series of cases, beginning with the year 1890, contracts involving the operation of railroads, often of the utmost complexity and extending over a long term of years, or perpetual, have been enforced specifically. In the leading case of the series a controlling reason for the decision was that the interests of the general public would have been injuriously affected by a failure to make the decree; but this reason appears to have dropped out of sight in the cases following this precedent"—citing numerous cases sustaining this last proposition. 36 Cyc. 587.

[12] As counsel for appellees, neither in their exhaustive brief nor extended oral argument, contended that the contract is unenforceable in a court of equity upon the ground that the court cannot efficiently compel appellant to perform its obligations under the contract, this claim must be treated as abandoned, and therefore will be disregarded. Crawford v. Heysinger, 123 U. S. 589, 8 Sup. Ct. 399, 31 L. Ed. 269; Home Benefit Association v. Sargent, 142 U. S. 691, 12 Sup. Ct. 332, 35 L. Ed. 1160; Repauno Chemical Company v. Victor Hardware Co., 101 Fed. 948, 42 C. C. A. 106.

[13] Is appellant's position so unconscionable that a court of equity should withhold the relief? That specific performance is not a matter of right, but one of discretion in the court, and that it will not be decreed when the contract is unfair, one-sided, or unconscionable, nor when the granting of the decree will be harsh and oppressive, is undoubtedly true, and requires no citation of authorities to sustain it. But, on the other hand, the discretion of the court does not mean, in the language of Judge Sanborn, speaking for this court in Shubert v. Woodward, supra:

"In its arbitrary, whimsical will, but in the sound, judicial discretion, informed and directed by the established principles, rules, and practices of equity jurisprudence. Hennessey v. Woolworth, 128 U. S. 438, 9 Sup. Ct. 109, 32 L. Ed. 500. Nor are these principles and rules and this practice hard, fast, or without exception. They are rather advisory than mandatory, and the application of the rules and of the exceptions to each particular case as it arises is still intrusted to the conscience of the chancellor, for these principles and rules and this practice serve to inform the intellect and to en-

lighten the conscience and by them the judicial discretion of the court must be guided."

Applying these rules to the facts in this case, the question is, In what respect is the contract unconscionable, and will a decree work a great hardship and injustice, unforeseen when the contract was made? It is argued:

"That the agreement to pay appellant the monthly toll of $70,000 in consideration of the construction of a pipe line and related facilities by the appellant, for carrying the oil produced by the Central Company, on the representations made and the mistaken belief engendered by the appellant that to supply these transportation facilities it would incur an expense of $3,000,000, whereas the bill of complaint admits that the total amount expended was but $700,000."

But there is not a line or word in the bill nor the contract warranting this statement. All the contract contains on that subject is found in paragraph 6b, and is as follows:

"The Central Company shall be charged and shall pay to the Texas Company for each month of the life of this contract the sum of $70,000."

And the bill charges that this was to pay the cost of transportation from the oil fields to Miller's Switch Station south of Dallas, Texas, on the Houston & Central Railroad. The demurrer admits the truth of these allegations. What, if anything, is unconscionable in this charge, counsel for appellees have failed to explain, nor can we find anything in the record which would justify us in so finding. From the terms of the contract it appears that appellees at that time expected to produce at least 540,000 barrels every month, for otherwise why should the contract provide that appellant "shall not be required to receive more than 20,000 barrels in any one day nor more than 540,000 barrels in any one month of thirty days and on the same basis as to other months?"

Had the Central Company tendered the quantity the Texas Company was bound to receive and pay for, the charge for the transportation to Miller's Switch would have been not quite 13 cents per barrel. That this is not an exorbitant charge is shown by the fact that paragraph 4 of the contract provides that for all deliveries made at Houston or Humble, Tex., the appellant shall pay an additional allowance of 12½ cents per barrel. If the parties considered 12½ cents per barrel a fair remuneration for transporting the oil from Miller's Switch to Houston or Humble, the court would not be justified in finding that 13 cents per barrel from Bartlesville, Okl., to Miller's Switch, Tex., would be so unreasonable that it should be treated as unconscionable. But, even if the charge of 13 cents a barrel is a higher charge than is usually made for like services, the excess is balanced by the obligation of the Texas Company to pay for the oil a higher price than the prevailing market at that time required. True, if the production greatly diminishes, the price for the transportation rises, and it becomes a hard contract for the Central Company, but, if the production increases and the price of oil decreases, it will be a hard contract for appellant, as the contract provides for no reduction of the price to be paid by the Texas Company in such case, while it does make provision for a higher

price in case there is a rise in the market value of the oil. . All contracts to be performed in the future are subject to market fluctuations, contracts for the sale of realty as much as any other. But no case can be found where a court of equity has refused to decree specific performance of a contract for the sale of real estate upon the ground that after the contract was made the value of the property had greatly increased. Had they seen proper, the parties could have guarded against such a contingency by providing for it in the contract. As held in Marble Company v. Ripley, supra:

"Nor is it any reason for rescinding the contract that it has become more burdensome in its operation upon the complainants than was anticipated."

And further on the court said:

"It is not unconscionable because Ripley obtains a larger profit from it than was at first expected, or because the other party obtained less. Those were contingencies, the possibilities of which might have been foreseen. It could not have escaped the thought of the contracting parties that the expense of quarrying might possibly increase, and that the expense of sawing and preparing for market might either increase or diminish in the progress of time. Or that they took their chances. Besides, it is by no means clear that a court of equity will refuse to decree the specific performance of a contract, fair when it was made, but which has become a hard one by the force of subsequent circumstances or changing events."

Other authorities to the same effect are Franklin Telegraph Co. v. Harrison, supra; Bradley v. Heyward (C. C.) 164 Fed. 107, affirmed 179 Fed. 325, 102 C. C. A. 509; Schmidtz v. Louisville & N. R. R. Co., 101 Ky. 441, 41 S. W. 1015, 19 Ky. Law Rep. 666, 38 L. R. A. 809; Southern Ry. Co. v. Franklin & P. Ry. Co., 96 Va. 693, 32 S. E. 485, 44 L. R. A. 297.

The cost of the pipe lines and other facilities constructed by the Texas Company is a matter which, so far as the Central Company is concerned, is immaterial. What the Central Company was interested in, and what induced it to make the contract, was the opportunity to reach competitive markets for its oils, and thus avoid being compelled to sell all its products to the Prairie Oil & Gas Company without competition, that being the only company whose pipe lines, at that time, reached its fields. The appellant has fully complied with its part of the contract. It has built the pipe lines to the Central Company's oil fields, established adequate gathering stations and related facilities which enable it to perform all its obligations under the contract, and has been ever since, and is now, able to handle all the oil the Central Company may tender under the contract. No damage then can possibly result to the Central Company by reason of the fact that the Texas Company was able to construct these facilities at a less cost than was anticipated. The Central Company would not be benefited if the cost of furnishing these facilities had been four or ten times as much as it really was, and the converse is equally true. We can see nothing unconscionable or inequitable in this. There would be just as much merit in the contention that one who has contracted for the erection of a building or the construction of a railroad has the right to refuse to carry out his contract and pay for the same because the contractor was able to perform the contract at a much less cost than was anticipated

and therefore made a larger profit. In Franklin Telegraph Co. v. Harrison, supra, Mr. Justice Harlan, delivering the opinion of the court, after reviewing numerous authorities on that subject, said:

"In view of these principles, which we think are founded on wisdom, we are of opinion that the fact that the appellants could, at the commencement of this suit, or since, sell at an increased price the privilege for which the appellees paid by relinquishing a valuable contract and advancing a large sum of money,. and which privilege they now enjoy for the stipulated price of $600 per annum, is not sufficient to justify the court in withholding the relief asked."

[14] Did the court err in refusing the temporary injunction? Section 7 of the act of March 3, 1891, as amended by the acts of February 18, 1895, June 6, 1900, and April 14, 1906 (34 Stat. 116), in force at the time this appeal was granted, did not provide for an appeal from an interlocutory order or decree dissolving or refusing to grant a temporary injunction, or refusing to appoint a receiver, and this court would therefore be without jurisdiction to review such an interlocutory decree if an appeal had been taken from that alone. But, as this is an appeal from a final decree dismissing the bill, it brings the whole case here, including all interlocutory orders made during the progress of the case. Central Trust Co. v. Seasongood, 130 U. S. 482, 9 Sup. Ct. 575, 32 L. Ed. 985; Bailey v. Williford, 131 Fed. 242, 66 C. C. A. 229. As, in our opinion, complainant, upon the face of the bill, is entitled to a decree of specific performance, it was the duty of the court to grant the injunction as prayed.

[15] An injunction against the breach of a contract is to a great extent a negative decree of specific performance. And, even if for sufficient reasons specific performance may be refused, the modern rule is that an injunction must be granted if the equities justify it. Leading English cases on this subject are Donnell v. Bennett, Law Reports, 22 Ch. Div. 835, decided in 1883 by Mr. Justice Fry, the author of Fry on Specific Performance, and Met. El. Supply Co. v. Ginder, 2 Ch. Div. 799, and this rule of granting an injunction, although specific performance may be denied, has been followed by the American courts generally. It is most frequently exercised in contracts for personal services which cannot be enforced by specific performance. A valuable collation of the American authorities on this subject is found in the note to Harrison v. Glucose Sugar Refining Co., 116 Fed. 304, 53 C. C. A. 492, 58 L. R. A. 915. Other cases in point are Western Union Tel. Co. v. Union Pacific Ry. Co. (C. C.) 3 Fed. 423; Chicago & Alton Ry. Co. v. N. Y. L. E. & W. R. R. Co. (C. C.) 24 Fed. 516; Alpers v. San Francisco (C. C.) 32 Fed. 503; Brush-Swan Co. v. Brush El. Co. (C. C.) 41 Fed. 163; Colgate v. James T. White & Co. (C. C.) 180 Fed. 882; Standard Fashion Co. v. Siegel-Cooper Co., 157 N. Y. 60, 51 N. E. 408, 43 L. R. A. 854, 68 Am. St. Rep. 749; Dwight v. Hamilton, 113 Mass. 175; American Electric Works v. Varley, etc., Co., 26 R. I. 295, 58 Atl. 977.

In Singer Sewing Machine Co. v. Union, etc., Co., Holmes, 253, Fed. Cas. No. 12,904, Judge Lowell held:

"If the case is one in which the negative remedy of injunction would do substantial justice between the parties by obligating the defendant either to

carry out his contract or lose all benefit of the breach, and the remedy at law is inadequate, and there is no reason or policy against it, the court will interfere to restrain conduct which is contrary to the contract, although it may be unable to enforce a specific performance of it."

But it is earnestly contended that whereas in fact only $900,000 has been expended by the Texas Company in the cost of the construction of the pipe line and the other facilities necessary to be provided by the Texas Company, the affidavits, read on behalf of the appellees' at the hearing of the motion for the temporary injunction, established the fact that the monthly payment of $70,000 assumed by the Central Company was based solely on the estimate that the cost of the construction would amount to $3,000.000, on which sum 28 per cent. per annum was to be allowed. As all of the negotiations were conducted prior to the execution of the contract, that evidence was clearly inadmissible, as its tendency was to vary the written contract, which the law conclusively presumes includes the final agreement, reached when the minds of the parties had finally met. That a court of equity will permit the introduction of parol evidence for the purpose of correcting mistakes in written instruments, or contracts obtained by fraud, either by reforming the instrument or if necessary rescinding it, or refusing a specific enforcement, if such an issue is raised by the pleadings, is no doubt true. But there is no such issue in this case, nor any evidence to establish the fact that there was a mistake as to the amount to be paid. In fact, the contract itself negatives it.

Newton v. Wooley (C. C.) 105 Fed. 541, decided by the writer of this opinion, is among the cases relied upon by counsel for appellees, but an examination of the facts in that case will show how inapplicable it is to the issues in the case at bar. That case was determined upon proofs taken in the usual course of equity procedure, after the issues had been made up. The answer of the defendant expressly charged that the contract sought to be specifically enforced did not contain all the terms of agreement between the parties, but that the agreement on which the minds of the parties had met required the complainant to procure parties who would sell to defendant on credit, in addition to the rolling stock mentioned in the contract, the rails, bolts, and spikes for the construction of the railroad, and, if credit could not be obtained, the funds necessary to purchase them for cash would be furnished: that these provisions, except as to the rolling stock, which defendant could himself procure on credit, were omitted from the contract by the mistake of the scrivener who prepared it, and was not noticed by either of the parties until shortly before the institution of the suit; that complainant was unable to secure the rails, bolts, and spikes, and did not furnish the money necessary to purchase them. Although there was some conflict in the testimony on that point, the court found those issues in favor of the defendant, and also found as a fact that this omission in the contract was by the mistake of the stenographer who wrote it, and that the contract was signed by the parties in the absence of the attorney who had prepared and dictated it as the attorney for both parties, and without having been read over by him or the parties, both of them being under the impression at the time that the contract contained all the stipulations agreed upon.

In the instant case no such contention is made by any plea of appellees, nor do the affidavits establish such a state of facts, or a mistaken mutual assumption of an existing fact. The most that can be said to be established by the affidavits is that there was a mistaken assumption as to a matter to be performed in the future. Such mistakes will not justify reformation, rescission, or denial of specific performance. Chicago, etc., Ry. Co. v. Wilcox, 116 Fed. 913, 54 C. C. A. 147; Farwell v. Colonial Trust Co., 147 Fed. 480, 78 C. C. A. 22. The nego-tiations between the parties were conducted for a considerable length of time, and many changes in the propositions and counter proposi-tions were made before the final agreement was reached. No doubt, for the purpose of avoiding such controversies as this, the parties inserted the following provision in the contract:

"(13) It is mutually acknowledged and agreed that this agreement shall be deemed to have superseded and shall take the place of every and any other instrument purporting to be an agreement between the parties heretofore entered into, or signed or delivered or purporting to have been signed or delivered upon behalf of said parties or either of them."

To review critically all the citations in the elaborate briefs of counsel would unnecessarily prolong this opinion, lengthy now, and serve no useful purpose, as a careful examination of them discloses that they are distinguishable upon the issues as well as the facts, and therefore inapplicable to the case at bar.

It may be that after the issues are made up and the proofs in complainant will not be entitled to a decree of specific performance upon the final hearing, but upon the allegations of the bill, and a careful examination of the affidavits submitted to the court below on the hearing of the application for the temporary injunction, we are of the opinion that the equities in this case are so imperative, the remedy at law so inadequate, that a court of equity should exercise its power and grant relief to complainant. The temporary injunction as prayed in the bill should be granted, and, if necessary, a receiver of the property appointed.

The decree of the court below is reversed, with directions to grant a temporary injunction, and proceed in conformity with this opinion.